Richard AUGUSTINE, Appellant,

v.

STATE of Indiana, Appellee.

No. 782 S 251.

Supreme Court of Indiana.

April 2, 1984.

Rehearing Denied May 18, 1984.

J. Richard Kiefer, Frank E. Spencer, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Richard Augustine was found guilty by a jury in the Lake Superior Court of murder. He subsequently was sentenced by the trial judge to a term of thirty years imprisonment. He now directly appeals and raises the following five issues:

1. denial of Appellant's Motion for a New Trial based on newly discovered evidence;

2. sufficiency of the evidence;

3. alleged error in the trial court's refusal to give certain tendered final instructions;

4. ruling of the trial judge that certain testimony was inadmissible; and

5. alleged ineffective assistance of counsel during trial.

The facts show that on December 29, 1980, Appellant's former wife, Rose Augustine, was at the El-Mar Restaurant in Merrillville with Anthony Rondinelli. Rondinelli had known Appellant for approximately ten years through the insurance business and was associated with Rose Augustine through his claims adjusting firm, Mid-States Claim Service. While Appellant was talking with his former wife, Rondinelli walked by. Appellant offered to shake hands but Rondinelli refused. There is some conflict in the evidence but Rose testified that Appellant told her: "Give your friend a message that he should watch what he says too." As Appellant and Rose sat in the lobby talking, Tom Kidd walked out to use the lobby telephone. Rose testified that Appellant thereupon stated that if Kidd was present, he had better leave because he did not want to cause any trouble. Appellant left and Rose returned to the lounge to join Rondinelli and Kidd. The three drank heavily that night until approximately 10:00 p.m. when Appellant returned to the lounge and talked to Rose in the lobby. Rondinelli had gone to his automobile with a steak knife to cut some cheese purchased earlier. When he came back

into the restaurant, Appellant and Rose were sitting in the lobby. Rondinelli came up and told Appellant that he had had enough of his remarks. Rose told Rondinelli that Appellant was leaving. Several witnesses testified that Kidd came out into the lobby, grabbed Appellant by his lapels and told him that he was going. The altercation became loud and the manager of the lounge, Richard Hudson, walked over to Rose and asked her to calm Rondinelli down. Hudson testified that Rondinelli approached Appellant and "might have poked him in the chest." Kidd then indicated that he was going to remove Appellant from the lounge. Kidd grabbed Appellant and pushed him out the door. Several witnesses saw the two men arguing between two cars in the parking lot, one car belonging to Appellant. There was evidence that Appellant said that he was going to leave. Witnesses saw Appellant pull out a gun and shoot Kidd in the abdomen. Kidd grabbed his abdomen and turned towards Hudson before slumping into a sitting position against one of the automobiles. Appellant again raised the gun and Hudson shouted "Don't do it" but Appellant shot Kidd again. Hudson saw Appellant approach Kidd on the ground, hold the gun close to his neck and fire. Only three or four seconds elapsed between shots. The evidence showed that after Appellant had shot Kidd three times, he said: "You can call the police now because he is dead."

Appellant testified that he considered himself in imminent peril when he pulled out his gun and started shooting. He said that he knew Tom Kidd carried a gun because he had seen him armed on several occasions. He added that while Kidd was shoving him out of the restaurant and into the parking lot, he felt a hard object on Kidd and presumed that it was a gun. No gun was found on Kidd after the incident. Appellant acknowledged that he shot Kidd after Kidd had slumped to the ground but did so because he believed Kidd was still a threat to him since he could have grabbed a gun even in that position. There was evidence that Kidd had a reputation for being rowdy when drinking and for carrying a

firearm. Kidd had been barred from several local drinking establishments because he was argumentative and caused problems when he was drinking.

The pathologist who performed the autopsy on Kidd identified three bullet wounds. One was a grazing wound from Kidd's chin downward. Another wound, described as the fatal wound, came from the left side of Kidd's back just below his tenth rib and upward through the right side of his heart. A final wound extended from Kidd's upper abdomen through his lower back. This bullet did not affect any vital organs and apparently was the first shot. The pathologist testified that the shots fired after Kidd was on the ground caused his death. The pathologist also testified that Kidd's blood alcohol level was .375 which he described as highly intoxicated. A Merrillville police officer with more than eight years of experience testified that he had never known a suspect or seen an individual with a blood alcohol content greater than .3 and that anyone with a blood alcohol content of .375 is "blasted." A Merrillville police department technician who operated that department's breathalyzer testified that the highest blood alcohol content he had ever seen was .3.

Patrons at the restaurant who were in the parking lot saw Appellant shoot Kidd while Kidd was kneeling on the ground against a car. Their testimonies were that Appellant was from one foot to six feet away when he fired the additional shots. There was other testimony, however, that there were no powder burns on Kidd's body which would indicate that Appellant's gun was more than four or five feet away from Kidd when fired.

I

In his belated motion to correct errors, Appellant moved for a new trial on the basis of newly discovered evidence. This request was denied by the trial court. The evidence Appellant claims to have discovered after trial was that Kidd, Rose Augustine and Rondinelli were together involved

in an illegal insurance kickback scheme. Appellant further alleged that Kidd suspected that Appellant knew too much about their secret and therefore threatened to seriously injure Appellant. Neither Kidd's motive nor his uncommunicated threat were known to Appellant at the time of trial.

The secret relationships between Rose Augustine, Tom Kidd and Tony Rondinelli involved the South Lake Construction Co. Rose Augustine testified that as a broker for several insurance companies, she would refer claims against these companies by their insureds to Rondinelli who operated an adjustment company. Rondinelli in turn would contact Tom Kidd who fronted as the South Lake Construction Co. owner. Kidd would hire subcontractors to do the work referred to him by Rondinelli and would be paid by the insurance companies for the work done. Tom Kidd took in approximately $75,000 a year in this manner and divided the money between Rose Augustine, Rondinelli and himself. There was evidence at trial that a secret relationship amongst an insurance broker, a claims adjuster and the owner of a contracting company was grossly unethical in the insurance industry and there were inferences that Rondinelli, Kidd and Rose Augustine may have violated certain federal criminal laws. There was evidence that in mid-November, 1980, the Internal Revenue Service began to investigate South Lake Construction Co. Rose Augustine testified that she, Kidd, and Rondinelli had discussed Appellant and believed that he had discovered their involvement in South Lake Construction Co., and probably was the one who contacted the Internal Revenue Service. Rose also testified about a meeting they had just prior to the El-Mar Lounge incident during which Kidd claimed that he was going to take care of Appellant by breaking his legs and arms the next time he saw Appellant. The next time Kidd saw Appellant was the night he was killed according to Rose. Appellant claimed that he suspected that Rose and Rondinelli were connected with South Lake Construction Co. but that he did not know how they were connected and certainly did not know that they were partners in crime.

The standard of review in determining whether or not newly discovered evidence entitles a defendant to a new trial pursuant to Ind.Tr.R. 59(A)(6) has been stated by this Court as follows:

" . . . to gain such relief the evidence must meet a nine part test:

'(1) [T]hat the evidence has been discovered since the trial; (2) that it is material and relevant; (3) that it is not cumulative; (4) that it is not merely impeaching; (5) that it is not privileged or incompetent; (6) that due diligence was used to discover it in time for trial; (7) that the evidence is worthy of credit; (8) that it can be produced on a retrial of the case; and (9) that it will probably produce a different result.' *Tungate v. State*, (1957) 238 Ind. 48, 54–55, 147 N.E.2d 232, 235–36."

*Wiles v. State*, (1982) Ind., 437 N.E.2d 35, 39, *reh. denied.* In determining whether newly discovered evidence would probably produce a different result in a retrial, this Court further has held:

"In considering this part of the test we have stated, 'In order for newly discovered evidence to warrant a new trial, it must be such as to raise a strong presumption that, in all probability, it would produce a different result upon a re-trial.' *Helton v. State*, (1980) Ind., 402 N.E.2d 1263, 1267. Alternatively we have stated, '[T]he newly discovered evidence must be material and decisive in character and be such as to raise a strong presumption that it will, in all probability, result in an opposite conclusion on another trial.' *Marshall v. State*, (1970) 254 Ind. 156, 162, 258 N.E.2d 628, 631. In yet another case we stated, '[I]n the absence of a clear indication that the new evidence would probably effect a change in the result of the previous trial a retrial need not be granted.' *Bradburn v. State*, (1971) 256 Ind. 453, 459, 269 N.E.2d 539, 543."

*Wiles,* Ind., 437 N.E.2d at 40. The denial of a motion for a new trial based on newly discovered evidence will be reversed only if the trial court abused its discretion in concluding that a different result upon retrial would not have been possible. *Harden v. State,* (1982) Ind., 441 N.E.2d 215, *cert. denied* (1983) —— U.S. ——, 103 S.Ct. 794, 74 L.Ed.2d 998. Moreover, the burden falls on the defendant to show that the newly discovered evidence meets the prerequisite for a new trial. *See Best v. State,* (1982) Ind.App., 439 N.E.2d 1361.

■ The State now contends that with reasonable diligence on Appellant's part, the evidence presented in Appellant's motion could have been discovered prior to trial. Appellant stated that he was aware of some connection between these parties and the construction company but that he did not know the full details. He did not, however, relate this knowledge to his trial counsel. Rose testified that she had her private counsel talk to Appellant's trial attorney to tell him not to bring South Lake Construction Co., into Appellant's trial. Rose said that Appellant's trial attorney agreed not to do so. Rose's allegation was denied by Appellant's trial attorney who claimed that he knew nothing of the subject from Appellant or anyone else. Notwithstanding this conflict in the evidence, Appellant fails to show that he could not have discovered this evidence prior to trial with reasonable diligence. After all, Appellant admitted that he was aware of a suspicious connection between the three.

The trial court further found that Rose Augustine's trial testimony rendered the alleged newly discovered evidence impeachment evidence only which, if used in a retrial, would probably not produce a different result. It was within the authority and discretion of the trial judge to make such findings and we are not inclined to second guess him in view of all the facts and circumstances here. Moreover, the newly discovered evidence is significant only to support the allegation by Rose Augustine that Kidd had made a threat to seriously harm Appellant the next time Kidd saw him. According to her testimo-

ny, the next time Kidd saw Appellant was at the El-Mar Lounge when the killing took place. Appellant, however, claims that he did not know of this threat therefore the threat could not be used by him to show that he had reason to believe that his life was in danger. The jury was informed that Appellant was aware that Kidd was known to be a rowdy and threatening person when he was drinking, that he carried a gun and that he was prone to cause trouble. There were no bruises or marks on Appellant after the incident and no weapon was found on Kidd. Furthermore, Appellant fatally shot Kidd after Kidd was on the ground holding his stomach. In view of these facts and circumstances, we will not say that the trial court erred by denying Appellant's motion for a new trial based on newly discovered evidence. *Carter v. State,* (1982) Ind., 438 N.E.2d 738.

## II

■ Appellant next argues that the evidence is insufficient to sustain his conviction for murder inasmuch as the evidence clearly shows that the shooting was done in self defense. This Court has held:

"When a self-defense claim is raised casting some reasonable doubt as to guilt, the State has the burden of proving beyond a reasonable doubt that the defendant did not meet at least one of the elements necessary to prove that justification. *Cox v. State,* (1981) Ind., 419 N.E.2d 737; *Loyd v. State,* (1980) [272] Ind. [404] 398 N.E.2d 1260. Self-defense is proved by showing that the defendant acted without fault, was in a place where he had a legal right to be, and was in real danger of death or great bodily harm or was in such apparent danger as caused him in good faith to fear death or bodily injury. *Cox v. State, supra; Berry v. State,* (1978) 268 Ind. 432, 376 N.E.2d 808. In Indiana, using deadly force for self-defense is justified only when a person reasonably believes such force is necessary to prevent death or serious bodily injury. Ind.Code § 35-41-3-2(a) (Burns Supp.1982). Even if a per-

son is assaulted, the trier of fact can rightfully find that a reasonable person in the same circumstance would not have been placed in reasonable fear of death or great bodily harm and therefore would not have been justified in the use of deadly force in self-defense. *Loyd v. State, supra.* The final determination of whether the State has met its burden to negate Appellant's claim rests with the trier of fact. A conviction in spite of a claim of self-defense will be reversed only if no reasonable person could say that the self-defense issue had been proved beyond a reasonable doubt."

*Spinks v. State,* (1982) Ind., 437 N.E.2d 963, 964. We already have related the evidence in some detail showing that all the facts and circumstances of this incident were presented to the jury. That evidence was in some conflict on certain details but showed facts from which the jury reasonably could infer that Appellant was not in danger of losing his life at the time he shot and killed Kidd and was not in a position where he reasonably had a right to feel that it was necessary to kill Kidd in order to save his own life. It was the province of the jury to resolve any conflicts in the evidence and to make the final determination. There was sufficient evidence before the jury to justify them in finding Appellant guilty of murder. We find no error on this issue.

### III

■ The trial court gave the jury final instructions 8 and 9 which detailed the definition of self-defense. Specifically, instruction 8 set forth the statutory definition of self-defense. Instruction 9 given by the trial court was a summary of the Indiana case law pertaining to self-defense. Appellant tendered additional instructions 3, 5, and 6 on self-defense which were refused by the trial court. In reviewing an issue concerning the refusal of an instruction, this Court reviews whether the tendered instruction is a correct statement of the law, whether there is evidence to support the giving of the instruction and whether the substance of the tendered instruction is

covered by other instructions. *Richey v. State,* (1981) Ind., 426 N.E.2d 389.

Appellant's tendered instruction 3 defined the crimes of battery, criminal confinement and attempt as forcible felonies and advised the jury that if Thomas Kidd was perpetrating or attempting to perpetrate any of these crimes upon Appellant, then Appellant had the lawful right to use deadly force to resist. Appellant's tendered instruction 5 defined forcible felony, bodily injury and serious bodily harm. Appellant's tendered instruction 6 defined the crimes of provocation and battery and advised the jury that if they found Thomas Kidd committed or was committing provocation or battery or attempted battery upon Appellant then they could consider whether or not that conduct contributed to the appearance of actual or immediate danger to Appellant. The trial court decided to refuse these tendered instructions because the only self-defense claim presented by the evidence was that Appellant shot Kidd to prevent serious bodily injury to himself.

■ The Indiana Code provides that "self-defense" may justify a person's use of deadly force if he reasonably believes deadly force is necessary: 1) to prevent serious bodily injury to himself or another, or 2) to prevent the commission of a forcible felony. Ind.Code § 35–41–3–2(a) (Burns Supp.1983). The trial court found that Appellant claimed that he was justified in shooting Kidd because he reasonably believed that Kidd was going to do him serious bodily harm. There is no evidence that Appellant shot Kidd in an effort to prevent a forcible felony. Instructions 8 and 9 given by the trial court sufficiently detail the defense as it applies to the evidence here and to the claim Appellant made. The jury was instructed that they had a right to find that Appellant acted in self-defense if, from his view, he had reason to believe that his life was in danger or that he would receive serious bodily harm based on the actions of the deceased at the scene. The refused instructions added nothing to this. Furthermore, all of the eyewitnesses testified that Kidd was in no

way attacking Appellant when Appellant shot Kidd. We therefore do not find that the trial court erred by refusing Appellant's tendered instructions 3, 5 and 6.

### IV

At trial, Appellant attempted to introduce testimony from Dr. Gutierrez to show Appellant's state of mind, intent, whether his conduct was normal under the circumstances and whether the circumstances would have produced a state of mind of fear in Appellant. The State objected to Appellant's proposed testimony arguing that this was within the province of the jury and that the jury could readily determine Appellant's state of mind without expert aid. The trial court agreed with the State and refused the testimony.

Whether Appellant shot Thomas Kidd in self-defense was a question of ultimate fact for the jury. *Ashbaugh v. State*, (1980) 272 Ind. 557, 400 N.E.2d 767. Whether a witness may give an opinion on an ultimate fact question is within the discretion of the trial court and this Court will review such an exercise of judicial discretion only for an abuse thereof. There is no error *per se* when a trial court does not allow such an opinion. *Shelby v. State*, (1981) Ind., 428 N.E.2d 1241. It is generally considered that when a person's state of mind is concerned, the jury is as well qualified to form an opinion based upon the facts presented to it as is any witness, even an expert witness. Opinion testimony on this subject, therefore, is not proper and a trial judge does not err by excluding it. *Shelby, supra; Ashbaugh, supra.*

### V

Finally, Appellant claims that he was denied the effective assistance of trial counsel. Our standard of review for such an issue is as follows:

"Regarding competency of counsel, it has been more than frequently stated by this Court that there is a presumption that counsel is competent and that strong and convincing evidence is required to rebut the presumption. *Lind-*ley v. State*, (1981) Ind., 426 N.E.2d 398; *Rinard v. State*, (1979) [271] Ind. [588] 394 N.E.2d 160; *Jones v. State*, (1978) [270] Ind. [141] 387 N.E.2d 440. Incompetency of counsel revolves around the particular facts of each case and the standard of review on this issue is the mockery of justice test as modified by the adequate legal representation standard. *Crisp v. State*, (1979) [271] Ind. [534] 394 N.E.2d 115; *Cottingham v. State*, (1978) 269 Ind. 261, 379 N.E.2d 984. This Court will not speculate as to what may have been the most advantageous strategy in a particular case. Isolated poor strategy, bad tactics, or inexperience does not necessarily amount to ineffective counsel. *Hollon v. State*, (1980) [272] Ind. [439] 398 N.E.2d 1273; *Smith v. State*, (1979) [272] Ind. [216] 396 N.E.2d 898; *Crisp v. State, supra.*" *Darnell v. State*, (1982) Ind., 435 N.E.2d 250, 256. Appellant now suggests that this Court should abandon this standard of review and accept the "minimum standard of professional representation test" used by the Seventh Circuit Court of Appeals and other federal courts. We find our test to be sound and decline to accept Appellant's suggestion.

Appellant specifically claims that his trial counsel failed to investigate evidence concerning the South Lake Construction Co. and, in fact, suppressed testimony concerning the South Lake Construction Co. so that the facts involving that company and the involvement of Rose Augustine, Rondinelli and Kidd could not be brought out. This is the same evidence he now proposes to bring forward as newly discovered evidence justifying a new trial. In his motion for a new trial based on newly discovered evidence, Appellant claims that this evidence was not available to trial counsel and could not have been discovered before trial through due diligence. He now claims that counsel should have recognized the importance of this evidence based on the meager facts he had about the matter. There is no showing that the meager information that trial counsel had would indi-

cate that the business involvement between these three people would in any way be pertinent to the issues being tried in this cause. Trial counsel's affidavit showed that he had no knowledge of the secrets involving the South Lake Construction Co. nor was he informed of any reason related to the South Lake Construction Co. which would have indicated a motive on the part of Kidd to kill or harm Appellant. From trial counsel's knowledge of the matter, it appears that such business dealings were not relevant to the issues before the trial court. More importantly, Appellant, by his own affidavit, indicates that he was aware of the involvement of the three persons in the South Lake Construction Co. but did not communicate his knowledge to his trial counsel. Appellant therefore will not now be heard to complain that his counsel did not find the matter important enough to investigate and present at trial.

There is conflicting evidence about whether or not Appellant's trial counsel agreed with Rose Augustine and her attorney not to bring up the South Lake Construction Co. matter during trial. Even assuming, *arguendo*, that this is true, there is no showing that Appellant's trial counsel was notified that this issue was relevant to Appellant's case so that he had any reason for pursuing the subject at trial. Apparently Appellant himself had much more knowledge of the subject than did his counsel and Appellant did not tell him about it. There is no showing of any inadequate representation so far as this matter is concerned.

 Other claims of ineffective assistance of counsel go to such matters as trial counsel's failure to file a motion *in limine* concerning certain evidence, trial counsel's failure to raise timely objections to certain evidence, and trial counsel's error in placing Appellant's reputation into evidence. These are all matters of trial strategy and tactics that do not necessarily demonstrate ineffective assistance of counsel. The employment of a particular tactic during trial may, of course, appear in hindsight to have been a poor choice or even

ultimately detrimental to Appellant's cause. For this reason we will not second guess trial counsel in matters of strategy and tactics if it appears that, within the context of trial counsel's entire representation of the accused, his representation was adequate and effective. The instant record indicates that Appellant's counsel gave Appellant more than adequate representation and, in fact, vigorously and competently defended him. Appellant's trial counsel demonstrated a full knowledge of the facts of the case and presented them in the best light available for Appellant. Trial counsel also filed motions for discovery, vigorously examined and cross-examined witnesses at trial and tendered proposed final instructions to the trial court. The things Appellant now claims his trial counsel should have done do not reduce Appellant's trial to a mockery of justice or show that Appellant received inadequate representation. *Carlyle v. State*, (1981) Ind., 428 N.E.2d 10. There is no error on this issue.

Finding no error, we affirm the trial court in all things.

GIVAN, C.J., and DeBRULER, HUNTER and PRENTICE, JJ., concur.