**Timothy KUTSCHEID, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 49S00–9105–CR–363.**

Supreme Court of Indiana.

June 10, 1992.

Steven C. Litz, Monrovia, for appellant.

Linley E. Pearson, Atty. Gen., Cynthia L. Ploughe, Deputy Atty. Gen., for appellee.

GIVAN, Justice.

A jury trial resulted in the conviction of appellant of Murder, for which he received the maximum sentence of sixty (60) years.

The facts are: In the fall of 1989, appellant and Sherry Miller were business partners operating Indy Ionics, a water treatment firm, where Doug Hauhn, Sherry's former husband, the victim in this case, worked as an installer. In the months prior to the killing, Doug and Sherry, who had split up in part due to Doug's substance abuse, resumed their relationship to some degree, to the chagrin of appellant, who saw Sherry socially, knew her friends and family, developed a relationship with her young son, let her use his Visa card for a Florida vacation with her son, named her the beneficiary of his life insurance policy, and wanted an exclusive relationship. A romantic triangle developed involving epi-

sodes such as appellant poisoning the flowers Doug sent to Sherry. Whenever appellant discovered Sherry had gone out with someone, he would become angry and scream at her.

In the last month of his life, Doug resumed his alcohol and drug abuse and began behaving erratically. He harassed Sherry's sister Peggy, blaming her for his failure to reunite with Sherry and repeatedly threatening her life. On Wednesday, December 13, 1989, according to appellant, Doug went to appellant's apartment, threatened him with a pistol, shot his television set and asked for money in exchange for leaving Sherry alone. The following day, Doug created such a disturbance at Peggy's house that it resulted in his arrest, whereupon he was found to have two firearms and a knife in his possession. That same day, Peggy's husband Nathan went to Sherry's apartment, discovered the door kicked in, and found a note from Doug explaining he had dropped in to get his work shoes. Doug was jailed that day.

Two days later, on Saturday, Doug was released from jail. He telephoned Sherry and repeated threats to kill both Sherry and Peggy. These threats were made known to appellant. That evening when Peggy and Nathan returned home, Doug was waiting in the parking lot of their apartment complex; the police were called, came and talked to Doug, and he left.

The next day, Sunday, appellant stopped by his apartment, where he discovered a log had been thrown through the balcony sliding door. Appellant called the police and apartment security and reported a television set had been stolen, along with a .22 caliber revolver from his night stand. He alerted Sherry and Peggy to be on the lookout for Doug and then proceeded to Sherry's apartment.

Some time later, Nathan received a call from appellant, who stated he had just shot Doug and had called the police. Nathan ran over to Sherry's apartment, which was only three units away, and had to step over Doug's body just inside the doorway. When officers arrived, appellant explained

that Doug had knocked on the door, pretending to be apartment security, and had been let inside; but when he had reached inside his coat pocket suddenly, appellant had shot him three times in the abdomen and once in the head with a Colt .45 automatic, killing him in self-defense. A steak knife was found beneath Doug's body and his hand appeared to have been cut by it. No charges were filed at that time.

Subsequent events and investigation, however, brought to light facts tending to cast doubt on appellant's version of the shooting. After autopsy results revealed some of the wounds angled upward, Detective Sergeant Michael Kelley re-examined the shooting scene and found a groove in the entryway linoleum—a "bullet track"—marking its path along the floor from where Doug's head had rested to where a dent was found in the metal edging strip at the lip of the foyer closet; upon opening the closet door, he discovered the expended bullet just inside, indicating the gunshot wound to the head had been inflicted while the victim was lying there on the floor.

The Wednesday following the shooting, appellant drove Vicky Spencer, the secretary at Indy Ionics, on some errands and explained he needed her help in getting Sherry to understand "why he had to do this and why these things had to happen." He explained he had needed to fire four shots because he had been trained as a soldier in Vietnam to "make sure they're dead." He also suggested to Vicky that "maybe I should find Bobby [Sherry's other former husband]. Maybe then Sherry would understand. Maybe if I take care of him." When Vicky responded, "No, Tim, that's crazy. You can't shoot everybody that Sherry goes out with," he replied, "I just won't wait so long the next time."

Later that winter, appellant and Sam Cobb, an installer for Indy Ionics, were driving to Farmland, Indiana on business. Cobb, who since the shooting had been hearing innuendoes of vindication from appellant, asked him the details of the incident. Appellant told him that after preparing the lighting in Sherry's apartment to blind anyone entering, donning a bullet-proof vest and arming himself with a .45 caliber automatic and a .25 caliber back-up pistol, he telephoned Doug and lured him over to the apartment with an offer of cash to leave Sherry alone. When Doug arrived, he came in, realized the situation, and asked whether appellant was going to shoot him. When told no, he asked if he could smoke a cigarette and was told yes.

When Doug reached into his jacket pocket for his cigarettes (which in fact were found in that pocket), appellant shot him in the abdomen with the .45. Seeing no blood, appellant fired two more rounds into Doug's abdomen as he fell to the entryway floor; he lay there moaning until appellant walked over and fired his fourth round into Doug's face. When Cobb asked why, appellant replied that "if you're going to shoot someone to kill them, to make sure they are dead so they cannot come back on you;" and that "Sherry thought Doug was so good looking—how good looking was he now?" After shooting the victim, appellant hid his vest and backup weapon in Sherry's son's closet, obtained a steak knife from the kitchen and put it beneath the body, and called 911 to report the shooting.

The following April, upon learning of appellant's admissions to Vicky Spencer and Sam Cobb, Detective Kelley sought and obtained a warrant for appellant's arrest for murder.

■ Appellant contends his conviction must be reversed due to ineffective assistance of trial counsel. He cites our standard adopted in *Lawrence v. State* (1984), Ind., 464 N.E.2d 1291 and acknowledges that to prevail on appeal, he must demonstrate both that counsel's performance fell below that of prevailing professional norms and that the result of the proceeding would have been different but for counsel's deficiencies. As appellant notes, we look to the totality of the evidence in reviewing the prejudicial impact of counsel's errors; in reviewing the performance, we assess each allegation of substandard assistance independently. *Smith v. State* (1989), Ind., 547 N.E.2d 817.

■ Appellant argues trial counsel was substandard in failing to effectively impeach the testimony of Sam Cobb. Appellant claims counsel did nothing to negate the impact of Cobb's testimony, neglecting even to question Cobb on cross-examination concerning appellant's remarks to him. However, unlike the ineffective impeachment condemned in *Smith, supra*, the omissions complained of here are not supported by assertions of prior inconsistent statements or other bases for impeachment. As the State points out, trial counsel did attempt to demonstrate that Cobb might have learned details of the crime from sources other than appellant. Counsel's refusal to reinforce the damaging allegations related by Cobb by repeating them further may be considered as a reasonable exercise of trial strategy, which we will not subject to hindsight analysis on review. *See Van Evey v. State* (1986), Ind., 499 N.E.2d 245.

■ Appellant argues his counsel was deficient in failing on direct examination to question him about the confession he allegedly had made to Cobb or about his admissions to Vicky Spencer. The State notes that Cobb and Spencer were the first and third witnesses, respectively, of a total of twenty called by the prosecution during their case-in-chief, while appellant was the only defense witness, and so counsel's decision not to resurrect the details of appellant's inculpatory remarks before the jury was a reasonable exercise of trial strategy. Appellant maintains in reply that "there comes a point where it simply does not make sense for an attorney not to ask certain questions," and declares that point was reached in this case when counsel failed to afford him the opportunity to negate the testimony of Cobb and Spencer. Appellant fails to demonstrate what counsel could have elicited through his testimony of such import for its omission to rise to the level of unprofessional error.

■ Appellant argues his counsel was deficient in failing to object to the State's introduction of his bulletproof vest and Cobb's testimony concerning it. After taking Cobb's statement, police obtained a search warrant for appellant's residence and recovered his bulletproof vest. On direct examination, appellant testified he had bought it ten or fifteen years previously after having been shot in the leg. He now asserts that since Cobb's testimony linked the jacket to the killing, counsel should have objected to its admission as irrelevant. Cobb's testimony, however, in fact did link the vest to the killing; it thus was relevant to rebut the self-defense claim. To show substandard performance in failure to object, an appellant must show that an objection, if made, would have been sustained. *Hunter v. State* (1991), Ind., 578 N.E.2d 353. We can find no ineffectiveness here in counsel's failure to object.

■ Appellant argues his counsel was ineffective in failing to procure and introduce the tape of the telephone call he made to 911 after the shooting in order to substantiate his testimony that his state of mind was "distraught" as opposed to the "very calm and very rational" demeanor reported by the first officers on the scene. He maintains that the tape "certainly" would have added credence to his claim of self-defense. He fails, however, to support his argument with any showing of the tape's contents; for all we can determine, it might have served only to further support the State's position that he was calm and collected. Proof of deficient representation by omission requires more than a speculative showing of a lost potential benefit. *See Drake v. State* (1990), Ind., 563 N.E.2d 1286. In his reply brief, appellant cites Detective Kelley's testimony at his *habeas corpus* to be let to bail hearing that appellant was emotional when he spoke to the dispatcher. The record reveals, however, that Detective Kelley described the emotionality in appellant's voice on the tape as "Somewhat. Not overly shook." Given this equivocal characterization, again, we cannot find fault with counsel's tactical choice here. *Van Evey, supra*.

■ Appellant argues counsel was deficient in failing to object to the testimony of the pathologist, Dr. Dean Hawley, concerning the angles at which the four bullets entered Doug's body. He argues there

were no foundational questions asked to qualify him as an expert in bullet trajectory, which is beyond the knowledge of the average person, citing *Summers v. State* (1986), Ind.App., 495 N.E.2d 799 for the requirement of a proper foundation to admit expert opinion. Nevertheless, in *Wissman v. State* (1989), Ind., 540 N.E.2d 1209, this Court held that despite the fact that an autopsy surgeon was not a ballistics expert, his training and experience as a forensic pathologist made him properly qualified as an expert witness regarding entry angles of shotgun pellets. *Summers, supra* is actually in accord, for there it was held that once the witness was properly qualified in his field, the extent of his knowledge as to a particular facet went only to its weight, not its admissibility. Again, as Dr. Hawley's testimony as to bullet trajectory would have been admitted even in the face of an objection, the failure to voice one was not deficient representation. *Hunter, supra.*

■ Appellant maintains counsel was ineffective in failing to object to improper opinion testimony as to an ultimate fact. During direct examination, the State questioned Detective Kelley concerning the details of his investigation, in part to explain why he waited nearly five months to obtain a warrant for appellant's arrest. He testified that even prior to taking statements from Sam Cobb and Vicky Spencer, due to having "questions on the head shot" he did not believe appellant's claim of self-defense, despite appellant's assertion at his pretrial hearing that Kelley had believed him.

Appellant maintains this direct testimony as to another witness's credibility was reversible error, citing, *inter alia, Head v. State* (1988), Ind., 519 N.E.2d 151; that counsel's failure to object to it thus was substandard performance; and that the degree to which it impugned his defense determined the outcome of his trial. He further cites *Augustine v. State* (1984), Ind., 461 N.E.2d 101, wherein we upheld the trial court's exclusion of opinion as to the defendant's state of mind regarding self-defense as being a question of ultimate fact, and

*Byrd v. State* (1991), Ind.App., 579 N.E.2d 457, and concludes that permitting expert testimony as to the credibility of another witness is error *per se.*

Here, Detective Kelley's testimony did not go to the issue of the credibility of appellant's testimony, but rather was addressed to the chronological development of the State's case and the facts leading the officer not to believe the shooting was done in self-defense and why he pursued his course of investigation. Given this legitimate focus of Detective Kelley's testimony, had appellant's counsel objected such objection would have been properly overruled. Counsel thus was not substandard in failing to object. *Hunter, supra. See Sharp v. State* (1989), Ind., 534 N.E.2d 708, *cert. denied,* 494 U.S. 1031, 110 S.Ct. 1481, 108 L.Ed.2d 617.

■ Appellant argues trial counsel was deficient in failing to object to a violation of his Ind.Crim. Rule 4 speedy trial rights. On April 20, 1990, appellant by counsel Steven Litz moved for a speedy trial, and the court set June 14, 1990 as the trial date. On May 2, 1990, attorney Litz withdrew and the court appointed Mark Rutherford, who requested a prompt hearing on appellant's motion to be let to bail and objected to its being continued to June 12. The following day, the court vacated the June 14 trial date, without objection, and reset the bond hearing for July 11. The pretrial/bond hearing began on that date but was continued to August 1 upon the parties' joint motion. Trial then was set for August 30, and then reset to September 24 due to a congested calendar.

Appellant maintains counsel was deficient in failing to request discharge at the end of the 70–day period, June 30, 1990, and in failing to object to the setting of a new trial date outside the Rule 4 window, thereby waiving his speedy trial request. He acknowledges counsel's requests for an expedited bond hearing and for appointment of physicians to examine him regarding competency and sanity, but he maintains a desire to be let to bail is not inconsistent with a speedy trial request, and points out that the suggestion of insanity

was filed without his knowledge or consent and was withdrawn at his request at the pretrial hearing.

Nevertheless, Crim.R. 4(B) by its plain language applies only to incarcerated defendants; hence being released on bond would serve as a speedy trial waiver, and delay due to scheduling witnesses and court time for a bond hearing requested by the defendant in a murder case logically could be chargeable to the defense. *See Graham v. State* (1984), Ind., 464 N.E.2d 1. Moreover, in light of the facts in this case, we can say with some assurance that counsel would arguably have been more ineffective in failing to investigate an insanity defense than in biding his time waiting for seventy days to pass; counsel's decision here clearly was an acceptable choice of strategy. *Van Evey, supra.* As appellant concedes, the Crim.R. 4 waiver did not occasion sufficient prejudice for reversal because his defense was not impaired thereby.

As appellant fails to demonstrate substandard performance, much less cumulative prejudice resulting in a trial the result of which was unreliable, we cannot find he was denied effective assistance of counsel.

Appellant contends the trial court erred in allowing the State to introduce expert testimony absent a proper foundation. As discussed above, trial counsel failed to object to the pathologist's testimony regarding the trajectory angles of the victim's bullet wounds; we held this not to be substandard performance because the objection would have been overruled. When Dr. Hawley went on to opine that the victim was already falling or fallen at the time he was shot, defense counsel did object there was no foundational showing to qualify the doctor as an expert in crime scene reconstruction.

Appellant argues admission of this expert testimony was an abuse of discretion because no showing was made of Dr. Hawley's experience with bullet trajectories and body positions. As alluded to above, however, his qualification as a forensic pathologist rendered the testimony here at issue admissible. *Wissman, supra.* Any ques-

tion as to his experience with any particular facet of his field went only to that item's weight. *See Summers, supra.* We see no error here.

Appellant contends the trial court committed fundamental error in admitting Detective Kelley's testimony that due to the head wound he never had believed appellant's explanation of self-defense and conducted his investigation accordingly. He cites *Kelley v. State* (1991), Ind.App., 566 N.E.2d 591 for the proposition that admitting testimony as to another witness's credibility is error, but waivable absent objection, and urges us to overrule *Kelley* to find fundamental error. However, as decided above, the detective's testimony did not comprise objectionable error, let alone fundamental error.

█ Appellant contends the evidence was insufficient to support his murder conviction. He argues that the State failed to rebut his affirmative defense of self-defense. He maintains he was in a place he had a right to be, that he and the others were in fear of Doug for their safety, and that he acted in good faith and without fault, and argues that under *Spinks v. State* (1982), Ind., 437 N.E.2d 963 the State was required, but failed, to rebut at least one of these three elements of self-defense.

Appellant focuses his argument on the second element, maintaining that while under *Hill v. State* (1989), Ind., 532 N.E.2d 1153 once an assailant is disabled subsequent gunshots tend to fall outside the realm of self-defense, his culpability ultimately depends upon his reasonable perception of imminent serious injury to himself, citing Ind.Code § 35–41–3–2(a) and *Whipple v. State* (1988), Ind., 523 N.E.2d 1363. Appellant reminds us of Doug's violent episodes prior to his death; that appellant was taught in the Army to react swiftly to violence; that he did not see blood until after the fourth shot; and that to require a person acting in self-defense to inquire into the victim's condition after each shot "would violate the very tenets upon which the theory of self-defense is based."

■■■■ Appellant also argues the only evidence tending to rebut his self-defense claim, the testimony of Sam Cobb, is entirely unbelievable, apparently alluding to Cobb's prior criminal record, and cites *Brown v. State* (1983), Ind., 453 N.E.2d 232 for the proposition that evidence which is inherently improbable cannot support a conviction. While appellant is correct in citing *Harden v. State* (1982), Ind., 441 N.E.2d 215, *cert. denied,* 459 U.S. 1149, 103 S.Ct. 794, 74 L.Ed.2d 998 that there must be substantial evidence of probative value to support a conviction, our standard on sufficiency review is that we consider only the probative evidence and reasonable inferences *supporting* the verdict, without weighing the evidence or judging witness credibility, to see whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Id.; Braswell v. State* (1990), Ind., 550 N.E.2d 1280. Upon review, therefore, appellant's emphasis on the weight of his evidence of the fear Doug engendered in everyone around him is of no moment.

Further, while Cobb's testimony was the most direct evidence going to appellant's culpability, it was not the only direct evidence, and certainly not the only evidence, offered by the State to rebut this state-of-mind element of appellant's self-defense claim. Cobb's history, moreover, of criminal convictions was explored fully on cross-examination and does not render his account inherently improbable. As set forth in some detail at the outset of this opinion, Vicky Spencer's testimony provided additional direct evidence of appellant's culpability. The State's remaining eighteen witnesses supplied other indirect and circumstantial evidence, medical and otherwise, to complete a picture of a love triangle which culminated in a crime set up to look like a killing done in self-defense. The evidence clearly was sufficient to support appellant's conviction of murder.

■■■ Appellant contends the trial court erred in sentencing him to the maximum term of sixty (60) years. Noting the court found only one mitigating circumstance, his lack of a criminal record, appellant argues the court contravened the sentencing statute, Ind.Code § 35–38–1–7.1(a). In excluding it as a mitigator, the court found that appellant's clean record was the only mitigating factor and "that's not a sufficient reason for a reduction of any sentencing on a murder offense." The court went on to list several aggravating factors, including appellant's lying in wait and wearing a bulletproof vest, that the murder was specifically set up and would have occurred "if not this night then some other night," that appellant was in need of correctional rehabilitative treatment provided only by a penal facility, and that imposition of a reduced sentence would depreciate the seriousness of the crime. The court then stated that "with the determination of those kinds of aggravating factors the Court will have to increase the sentence an additional twenty years."

Appellant maintains that because the statute makes no distinction between murder and other crimes regarding the use of mitigating factors, the trial court erred in assigning, due to the conviction being for murder, no weight to his clean record, and in finding that "whenever there's any kind of reduction on a murder offense then there has to really be some serious mitigating factors" in refusing to depreciate the seriousness of the crime. The fact the conviction was for the crime of murder served to determine the presumptive forty-year term and the range of possible subtraction for mitigation, ten years, and possible enhancement for aggravation, twenty years. Ind.Code § 35–50–2–3. Within this range, factors in mitigation and aggravation carry the same relative weight for murder as for the other felonies covered under Ind.Code § 35–38–1–7.1, which states:

"Sec. 7.1. (a) In determining what sentence to impose *for a crime,* the court shall consider:

(1) the risk that the person will commit another crime;

(2) the nature and circumstances of the crime committed;

(3) the person's:

(A) *prior criminal record;*

(B) character; and

(C) condition.... [Emphasis added.]"

The statute contemplates consideration of a defendant's prior record in determining sentence for any crime.

Appellant further points to remarks of the trial judge during settling of the instructions as bearing on his failure to follow the substance of the prescribed form for balancing aggravators and mitigators. We see no connection between the judge's remarks and the later sentencing of appellant.

A sentence authorized by statute, *i.e.*, within the statutory range for that offense, will not be revised except where the sentence is manifestly unreasonable. A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to that particular offense and offender. Ind. Appellate Rule 17(B); *Sims v. State* (1992), Ind., 585 N.E.2d 271.

In the case at bar there is ample evidence to support the sentence. The testimony of Vicky Spencer that appellant stated his intent to deal in a similar manner with Sherry's other former husband is evidence of the risk that appellant would commit another crime and the calculating and brutal nature of the crime serves to support the twenty-year enhancement to the maximum term. Appellant's sentence is not manifestly unreasonable.

The trial court is affirmed.

SHEPARD, C.J., and DICKSON and KRAHULIK, JJ., concur.

DeBRULER, J., concurs in result and dissents with separate opinion.

DeBRULER, Justice, concurring in result and dissenting.

I too would affirm the conviction. I agree that defense counsel's professional performance in representing appellant before and during the trial was not, when considered as a whole, deficient in the constitutional sense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, in so concluding, I cannot regard counsel's failure to object to the testimony of Officer Kelley that he did not believe appellant's self-defense claim to be anything other than a patent and unreasonable professional error. This was tantamount to Officer Kelley testifying that he believed appellant guilty as charged.

There is no perspective from which the failure to object to such shenanigans can be regarded as anything other than error. *Head v. State* (1988), Ind., 519 N.E.2d 151.

Finally, I regard the maximum sentence to be manifestly unreasonable in light of appellant's lack of criminal history. Credit for this mitigating circumstance should be reflected in the sentence. I would reduce this maximum sixty-year sentence to fifty-years.