708 A.2d 1183

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT v. CHARLES L. JAMERSON, A/K/A CHARLES LESTER JAMERSON, CHAR-LIE, CHUCK, DEFENDANT–APPELLANT.

Argued December 2, 1997—Decided March 25, 1998.

320

322

*Abby P. Schwartz,* Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney).

*Deborah C. Bartolomey*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

COLEMAN, J.

This appeal involves convictions for reckless manslaughter based in part on operating a motor vehicle while under the influence of alcohol. Defendant was tried before a jury on two counts of second-degree reckless manslaughter, contrary to *N.J.S.A.* 2C:11-4b(1). The defense strategy was to demonstrate that defendant's conduct did not satisfy the recklessness standard. The question whether the victims' vehicle ran a stop sign was intertwined with the issue of recklessness. The State introduced testimony through a county medical examiner that defendant was operating his vehicle in a reckless manner at the time it collided with the decedent's vehicle.

The critical issues raised are (1) whether a medical examiner presenting opinion evidence regarding the manner in which a motor vehicle was operated at a given time must have qualifications beyond those required to be a medical examiner, and (2) if such additional qualifications are required, whether the medical examiner in this case possessed those qualifications. In an unpublished opinion, the Appellate Division concluded that although the medical examiner was unqualified to render such an opinion because he was not qualified as an automobile accident reconstructionist, the objectionable testimony was harmless error. We granted defendant's petition for certification. 149 *N.J.* 35, 692 *A.*2d 49 (1997).

We reverse and hold that the medical examiner in this case was qualified only as an expert in forensic pathology. Opinion evidence concerning whether a collision was accidental or the result of a driver's recklessness must be presented through someone with special qualifications, such as an accident reconstructionist. It is also beyond the expertise of a medical examiner to present

opinion evidence concerning the credibility of a witness's testimony regarding whether a traffic sign was obeyed.

I

-A-

On Friday, January 31, 1992, defendant, Charles Jamerson, and his cousin, Eric Ingels, spent the day together celebrating Ingels's twenty-eighth birthday. Defendant arrived at Ingels's home at 9:30 a.m. and suggested that they get breakfast and go out for some beers. They walked to a bar where they had an early lunch between 10:30 and 11:00 a.m. They remained at the bar until approximately 12:30 p.m. While at the bar, defendant consumed more than forty-eight ounces of beer and three ounces of Sambuca. Thereafter, they walked to defendant's father's house to pick up some money and to borrow his car, a red Chevrolet Cavalier that was involved in the fatal accident. Defendant and Ingels then drove to defendant's sister's house, carrying with them a twelve-pack of twelve-ounce beers. After consuming some beers at defendant's sister's house, defendant drove his sister to a bank. Upon returning, defendant continued to drink. Shortly after 2:30 p.m., defendant and Ingels left to pick up defendant's mother from her job in Glassboro. Ingels brought the remaining cans of beer from the twelve-pack. During that trip, the fatal accident occurred in Elk Township.

The accident occurred at the intersection of County Route 608, also known as Clayton Avenue, and County Route 553, known as Buck Road. The day was gray and windy, but the road was dry. Route 608 runs east and west and Route 553 runs north and south with one lane in each direction. A double yellow line, signaling "no passing," runs down the center of Route 553. The speed limit on Route 553 is fifty miles per hour. On Route 608, the posted speed limit is forty-five miles per hour and there is a stop sign at the road's intersection with Route 553. The stop sign is posted forty-five feet before the intersection. Route 553, on which defen-

dant was proceeding northbound at the time of the accident, is a through street.

Shortly before the accident, a Mercury Sable, operated by Robert McDermott, pulled onto Route 553 in front of defendant. McDermott testified that defendant and Ingels acted as though the Mercury Sable was "cutting them off," forcing them to slow down. From McDermott's point of view he did not "cut off" defendant. Rather, he maintains that when he pulled onto Route 553 defendant was quite a distance away, but gained rapidly at an estimated speed of between sixty-five and seventy miles per hour.

McDermott decided to make a right turn onto Route 608. As he slowed and signaled a right turn, he noticed a light-colored station wagon facing west (the opposite direction) on Route 608. The facts are in dispute concerning whether the station wagon was actually stopped at the stop sign on Route 608.

Seventy-seven-year-old John Ballard was the driver of the station wagon. His wife, seventy-four-year-old Anna Ballard, was also in the car. McDermott testified that Mr. Ballard looked directly at him, and then looked in the opposite direction before proceeding into the intersection. According to McDermott, defendant crossed the double-yellow line, went into the left lane, angrily gestured, and passed as McDermott was turning. After the Ballards' car pulled into the intersection, the front end of defendant's vehicle struck the left center portion of the Ballards' vehicle in the southbound lane of Route 553 in the intersection.

Elk Township Police Officer Milton Sahms arrived at the scene at 2:49 p.m. The officer called for a helicopter to transport Mrs. Ballard to Cooper Hospital. An ambulance took Mr. Ballard to Washington Memorial Hospital. He died within an hour.

Officer Sahms stated that when he arrived, defendant was acting "boisterous," "walking around the vehicle, hollering [and] speaking loudly," and had some minor injuries. The officer directed defendant to sit on the side of the road to await an ambulance. Defendant told Sahms that the accident occurred when he was

going around a car turning right and that Ballard ran the stop sign. Sahms smelled a strong odor of alcohol on defendant's breath and observed beer cans inside and outside of defendant's car. Sahms did not observe defendant slurring his speech or staggering, nor did he ask defendant when he had had his last drink. Sahms did not perform any field sobriety tests. Defendant and Ingels were taken to Washington Hospital.

The Gloucester County Medical Examiner, Dr. Claus Speth, arrived at the accident scene shortly after 3:00 p.m. After observing the crash scene and interviewing police officers who had obtained statements from witnesses, Dr. Speth went to the emergency room at Washington Hospital. He requested a physician to obtain blood and urine samples from defendant. Dr. Speth learned that Mr. Ballard had been pronounced dead. Dr. Speth proceeded to the Cooper Trauma Center to determine Mrs. Ballard's condition and to notify her of her husband's death.

Dr. Speth performed an autopsy on Mr. Ballard the next morning. He found crushing injuries to the left side of Mr. Ballard's body, consisting primarily of crushed ribs on the left side. Those crushed ribs caused the left lung to collapse. Mr. Ballard's pelvis, backbone, and spleen were crushed, and his liver and heart were torn. Death was caused by major injuries to the ribs, lungs, heart, liver, and spleen.

Mrs. Ballard sustained a significant head injury, a ruptured spleen, several rib fractures, a bruised lung, and significant injuries above and below the diaphragm. On April 5, 1992, she died of complications caused by the accident.

Kathleen Sandelier was an eyewitness to the accident and was called as a witness by defendant. She testified that she was driving behind defendant's car at the time of the accident. She testified that the Ballards' car entered the intersection without stopping for the stop sign. Her testimony was consistent with her statements to the investigating police officer at the accident scene. However, she gave conflicting statements to Dr. Speth in a post-accident interview. Sandelier acknowledged speaking to Dr.

Speth and stated that he "had [her] extremely confused as to what [she] saw." She admitted during cross-examination that trees on the side of the road partially obstructed her view of Route 608 and that she did not see clearly whether or not Ballard stopped for the stop sign. It was her "impression," however, that Ballard ran the stop sign.

Valerie Kennedy was also an eyewitness to the accident. She was traveling on Route 553 toward defendant when she observed McDermott turning right onto Route 608. She saw defendant's car come from behind McDermott and partially enter her lane. She was forced to pull halfway onto the shoulder to avoid a possible collision. She estimated that the majority of defendant's car was in her lane traveling at a speed of "high 50s [to] 60s." She observed defendant's vehicle strike the Ballard vehicle on the driver's side. She could not say whether the Ballard vehicle stopped for the stop sign.

Officer Seibert, who had investigated fatal accidents in Elk Township for six years, testified that the point of impact was in the southbound lane of Route 553. He found no skid marks on the road. Based on his investigation, he concluded that the cause of the accident was defendant's improper passing and drunk driving, and that Ballard did not seem to be at fault. He opined that if defendant had stayed in his lane and had not gone around McDermott the accident would not have occurred.

Charles Kearney, Senior Forensic Scientist at the New Jersey State Police Lab, tested defendant's blood using a gas chromatograph within an hour of the accident. He determined that defendant's blood alcohol level was .186. Dr. Charles Tindall, the Chief Forensic Scientist in charge of four State crime laboratories, was qualified as a witness in forensic toxicology. He testified that a man defendant's size with a blood alcohol level of .186 would have consumed approximately eight twelve ounce beers, or twelve ounces of 80 proof spirits. Dr. Tindall also testified that a person with a blood alcohol level of .186 is over twenty-five times more likely to be involved in an accident than a person who has not been

drinking. He stated that with a .17 blood alcohol level, the lowest level that defendant would have had at the time of the accident, a person would not be able to drive safely.

Lieutenant Leo Selb, an accident reconstruction expert, reconstructed the accident for the prosecution. Based on his investigation, he asserted that the crash occurred in the southbound lane of Route 553 and that defendant's car was moving back into the northbound lane when the crash occurred. He opined that at impact, defendant was traveling within the legal limit at about fifty miles per hour, which is seventy-five feet per second. He conceded that defendant's driving may only have been careless, but taking into account that defendant did not slow down, was passing in a no-passing zone, and had a .186 blood alcohol level, Selb characterized defendant's conduct as reckless.

Selb made a supposition "that Mr. Ballard stopped at the stop sign" and then proceeded into the intersection, accelerating to approximately twenty-six miles per hour at impact. The stop sign was posted forty-five feet before the intersection. Selb theorized that Ballard noticed McDermott's vehicle as the immediate hazard and proceeded into the intersection only after yielding to him.[1] Thus, Selb testified that "had Mr. Jamerson remained in his lane ... Mr. Ballard would have been able to safely negotiate that intersection and cross it." Furthermore, Selb indicated that once the drivers "got to where they were" in the intersection, they had .79 seconds to react. He concluded therefore, that neither driver could have avoided the accident, even if they had normal reaction time.

---

[1] Because of the stop sign, the law required Ballard to bring his vehicle to a complete stop within five feet of a real or imaginary stop line or crosswalk before entering the intersection and then proceed "only after yielding the right of way to *all* traffic on the intersecting [roadway] which is so close as to constitute an immediate hazard." *N.J.S.A.* 39:4-144. A motorist facing a stop sign is not only under a duty to stop before entering the intersection, but also is required to make further observation while proceeding through the intersection. *Cresse v. Parsekian,* 43 *N.J.* 326, 328, 204 *A.*2d 348 (1964).

-B-

Dr. Speth's problematic testimony was introduced in the following manner. He was qualified at trial as a forensic pathologist and not as an accident reconstructionist. Apart from describing the injuries found at the time of autopsy and the physiological causes of the deaths, Dr. Speth was questioned by the prosecutor regarding the nonphysiological "circumstances" of Mr. Ballard's death. During direct examination, Dr. Speth stated:

> Under the guidelines for a medical examiner, a medical examiner should be aware of the criteria by which one distinguishes what would be considered an accident versus a homicide. Now the medical examiner can use his determination as the evidence that any—this goes beyond the expertise. It's the evidence that any common man would use to reach the same conclusion. That's called prima facie evidence and the medical examiner uses the facts that he has collected to make determinations which are called prima facie; and based on ·all the evidence, I reached the conclusion that this was a homicide.

Thus, Dr. Speth concluded that Mr. Ballard's death was a homicide rather than an accidental death.

He further explained what he meant:

> Well the circumstances that would constitute that is that I determine [from] my own investigation and by my looking at the facts and the witness statements that the car crash had been caused by the red Cavalier and that this crash had caused the death of Mr. Ballard and that this—that the operator of the Cavalier had been driving under the influence in a manner—
>
> [Defense Attorney]: I object, Your Honor. He's not an expert. He's here as a pathologist. I certified him as a pathologist. I have never been given his report that he sets that forth. He's not an expert. We're going to hear from Dr. Tindall. I think that should be stricken. I do not certify that Dr. Speth, and I have a great respect for Dr. Speth, I've known him some time, but he's not here as an alcohol expert.
>
> THE COURT: [Mr. Prosecutor], do you have some foundation upon which this conclusion is based, that this witness can testify to, that is?

. . . . . . . .

At that point defense counsel continued his objection, arguing that Dr. Speth was qualified only as a pathologist and not as an "alcohol expert." In response to the objection, the prosecutor elicited information from Dr. Speth that qualified him to testify as an expert regarding the effects of alcohol on the human body. Dr. Speth testified that on Mr. Ballard's death certificate, he listed the

cause of death as "vehicular homicide," meaning that "the crash involved circumstances that would qualify it to be a homicide rather than an accident." He stated that if he had regarded this as an "accident," he would have listed the cause of death as a "vehicular accident."

During cross-examination, defense counsel explored Dr. Speth's opinion that Mr. Ballard's death was a homicide. According to the defense, the aim of the questioning was to neutralize the objectionable testimony elicited on direct. Defense counsel asked Dr. Speth whether it was always a homicide when an accident occurred while the driver was intoxicated. Dr. Speth answered "no," and continued:

> Well, what I am speaking about here is, is that I'm not judge and jury, I'm talking about prima facie evidence of facts. The facts are that we had a level above the per se level and we had driving conduct which was such, based on witness statements and scene evidence, the three factors [the alcohol, not slowing down and passing in a no passing zone] I discussed that I decided that this was a homicide, Mr. Sanderson.
>
> Q. Okay. You did not base that opinion on, however, what the facts were out of the accident scene. You just based it on the fact that one, there was a death; two, there was a motor vehicle accident; and three, that defendant was above the prescribed level.
>
> A. No, no. You've totally misquoted me. I said that I understood the circumstances of the crash. I didn't say that there was an accident. I understood the circumstances of the crash and I took that into account when I made my determination.
>
> Q. Well, you are not an accident specialist, are you?
>
> A. I don't know the term "accident specialist." I—
>
> Q. Well, accident reconstruction or someone who has been trained in motor vehicle accidents.
>
> A. Well, are we getting back into qualifications here?
>
> Q. Well, you—can't you tell me Doctor, whether you've got that?
>
> A. There are four levels of training in accident—
>
> Q. No, I didn't ask you to give the qualifications. I asked you if you are an expert. That is again, yes or no.
>
> THE COURT: I don't think he can answer this one, yes or no. I think he's allowed to elaborate on this one.
>
> [DEFENSE COUNSEL]: But, Judge, if the answer is no, then we don't need any more qualifications—we don't need any more statements.

THE COURT: No, I think he's got to state what he understands your question to mean and then answer it in that context.

[DEFENSE COUNSEL]: I'll withdraw the question.

Thereafter, defense counsel examined the possibility that Mr. Ballard had run the stop sign in order to impeach Dr. Speth's opinion that it was a vehicular homicide rather than a vehicular accident. Dr. Speth and defense counsel had the following colloquy:

Q. Doctor, in making up your determination, did you try to conclude how much time my client had to avoid the accident?

A. I don't understand the question.

Q. Well, before determining that this was a homicide, did you, in talking—you told us you talked to the witnesses, you told us you were at the scene. Did you make a conclusion as to how much time my client had to avoid the collision?

A. Well, I don't understand how your client can have time to avoid a collision that he caused. The person who can avoid a collision is the person who is not causing the collision.

Q. In other words, you think that a man on a through road who is confronted by a driver who comes out of a stop sign caused the collision.

A. Well, you're assuming facts here that are not in evidence. If you want me to assume facts that are not in evidence, you'll have to present—

Q. I beg your pardon, Doctor, they are in evidence.

A. You'll have to—

Q. I beg your pardon, they are in evidence. We've had witnesses to that effect.

THE COURT: What's the next question, please?

Q. Didn't you know that Mr. Ballard came out of a stop sign, the decedent?

A. I knew something very definite. I knew that Mr. Ballard had not—that there was no evidence available, there were no facts in evidence at any time that I knew of that Mr. Ballard had violated the stop sign. What I knew, and let me finish my answer please, what I knew from all of my investigation based on witness statements, personal observations of the crash scene is that Mr. Ballard—Mr. Jamerson was passing a northbound vehicle over a double line before the intersection, was in the wrong lane and broad-sided a slow-moving station wagon to such a degree that despite the mass difference between the station wagon and the Cavalier, caused the station wagon to completely reverse its direction without almost any drag in the direction that the station wagon was going.

Q. Uh-huh.

A. And despite the small mass of the Cavalier and that therefore, my conclusion was, based on witness statements and my observations, that the Cavalier was driving in the wrong lane, passing illegally and broad-sided a car in the middle of an intersection in the wrong lane. Now I might—therefore, I could not answer

your question where you asked me, did he have a chance to react or avoid an accident when he's the one causing it? How can I answer your question then?

. . . . . . . .

Q. Did you review the statement of Kathleen Sandlier?
A. Yes. And for that reason, I took my own statement from her which I have on a cassette here with me today if you would like to hear it.

Dr. Speth testified that he interviewed Kathleen Sandelier, a witness to the accident, who testified that it was her impression that the Ballard vehicle ran the stop sign. Dr. Speth determined that although she previously stated that the Ballard car ran the stop sign, she was not in a position actually to see the stop sign at the time of the accident. He explained that he went back to the scene and checked the location where Sandelier was positioned. Based on his own observations, he concluded that Sandelier could not have seen the stop sign.

## II

Defendant argues that because Dr. Speth was qualified only as an expert in forensic pathology, and not as an accident reconstructionist, he was not competent to testify that the accident was a homicide or that defendant's driving was reckless. Defendant also maintains that Dr. Speth was unqualified to comment on the credibility of Ms. Sandelier and that a witness's credibility is not a subject requiring expert testimony.

The State argues that because much of the disputed testimony was elicited by the defense during cross-examination, it cannot be grounds for reversal. The State also argues that Dr. Speth need not have been an accident reconstructionist because he based his opinions on personal observations and witness interviews following the accident.

### -A-

The crime of reckless manslaughter, of which defendant was convicted, is based on *N.J.S.A.* 2C:11–4b(1). That statute provides that "[c]riminal homicide constitutes manslaughter when . . .

[i]t is committed recklessly." *Ibid.* To determine whether the Ballards' deaths were homicides, the jury had to decide whether defendant operated his vehicle recklessly by consciously disregarding a substantial and unjustifiable risk that death would result from his conduct. *N.J.S.A.* 2C:2–2(b)(3); *State v. Bowens,* 205 *N.J.Super.* 548, 553, 501 *A.2d* 577 (App.Div.1985), *aff'd,* 108 *N.J.* 622, 532 *A.2d* 215 (1987). Because the deaths were caused by a motor vehicle and the Code of Criminal Justice also contains a subsection proscribing death by auto, *N.J.S.A.* 2C:11–5, we must begin our legal analysis by identifying the elements of the reckless manslaughter offense.

Before 1988, the standard of conduct proscribed in both the reckless manslaughter and the death by auto statutes was identical: recklessness. *State v. Milligan,* 202 *N.J.Super.* 336, 495 *A.2d* 132 (App.Div.1985), *aff'd,* 104 *N.J.* 67, 514 *A.2d* 1316 (1986). A conviction on only one of those offenses was permitted. Subsequent to the Supreme Court's decision in *Milligan,* (in which Justice Clifford dissented) the Legislature amended the death by auto statute to provide that if warranted by the evidence, a conviction for both offenses is permitted. It also provided that where a manslaughter indictment is based on the operation of a motor vehicle, death by auto shall be considered a lesser-included offense. L.1988, *c.* 75 (codified at *N.J.S.A.* 2C:11–5d).

The elements of reckless manslaughter in this case are (1) that defendant was the operator of the motor vehicle that struck the Ballards' vehicle, (2) that the Ballards' deaths were caused by the collision, and (3) that defendant caused those deaths by operating his vehicle recklessly.

■ The recklessness required for manslaughter is not the same as that required for death by auto. For reckless manslaughter, the State must prove beyond a reasonable doubt causative acts of recklessness that are different in kind from the acts involved in reckless driving that support a conviction for death by auto. *State v. Jiminez,* 257 *N.J.Super.* 567, 584, 608 *A.2d* 996

(App.Div.1992). Those additional acts of recklessness must also contribute to causing the death of a victim.

[ ] Although driving while intoxicated may alone satisfy the recklessness required by the death by auto statute, *State v. LaBrutto,* 114 *N.J.* 187, 204, 553 *A.2d* 335 (1989), more is required for reckless manslaughter. When, as here, the State relies on the extent of drinking as one of "the additional act[s] of death causative recklessness," that drinking must "be more than casual drinking and more than mere intoxication, rather, it would have to be exceptional drinking to a marked extent." *State v. Scher,* 278 *N.J.Super.* 249, 269, 650 *A.2d* 1012 (App.Div.1994), *certif. denied,* 140 *N.J* . 276, 658 *A.2d* 299 (1995). In other words, a defendant's predriving conduct, such as drinking, and conduct associated with the driving must be so extraordinary and extreme as to satisfy the reckless manslaughter standard. *Ibid.* That standard is "quantitatively greater than the recklessness contemplated in a death-by-auto charge and qualitatively less than the recklessness required to support an aggravated manslaughter case." *Milligan, supra,* 104 *N.J.* at 73, 514 *A.2d* 1316 (Clifford, J., dissenting). That is so because "[t]he practice in our State implicitly recognizes that only a gross deviation from reasonable care amounts to recklessness" required in a reckless manslaughter case. *State v. Concepcion,* 111 *N.J.* 373, 382, 545 *A.2d* 119 (1988) (Handler, J., concurring).

[ ] Although defendant's vehicle collided with the driver's side of the Ballards' station wagon, defendant has maintained throughout that the cause of the accident was Mr. Ballard's failure to obey the stop sign. Based on that factual contention defendant asserted that Ballard's running the stop sign, rather than the manner in which defendant operated his vehicle, proximately caused the accident. That contention raised a remoteness exculpation defense in terms of the cause of the accident, impacting the State's burden to prove that defendant recklessly caused the victims' deaths.

The Code requires the State to establish a causal relationship between a defendant's conduct and the resulting harm to a victim.

There is a "but for" requirement that is satisfied if "the result in question would not have occurred" without defendant's conduct. *N.J.S.A.* 2C:2–3a(1); *State v. Martin,* 119 *N.J.* 2, 11, 573 *A.*2d 1359 (1990). The "but for" requirement must be interpreted in the context of the mental culpability required by the Code for each offense. *N.J.S.A.* 2C:2–3a(2).

Regarding the recklessness culpability required for the manslaughter involved in this case, the Code provides:

> When the offense requires that the defendant recklessly ... cause a particular result, the actual result must be within the risk of which the actor is aware ... or, if not, the actual result must involve the same kind of injury or harm as the probable result and must not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.

<em>N.J.S.A.</em> 2C:2–3c.

Therefore, crucial to the issue whether defendant recklessly caused the victims' deaths was whether Ballard disobeyed the stop sign. Defendant contends that but for Ballard violating the stop-sign law, the collision would not have occurred and that the collision was so dependent on Ballard's volitional act that the objectionable testimony of Dr. Speth rendered his causation defense a nullity. If the killings were "accidental" or carelessly or negligently caused, a finding of not guilty would have been required. *State v. Reyes,* 50 *N.J.* 454, 464–65, 236 *A.*2d 385 (1967); *State v. Curtis,* 195 *N.J.Super.* 354, 369, 479 *A.*2d 425 (App.Div.), *certif. denied,* 99 *N.J.* 212, 491 *A.*2d 708 (1984).

-C-

The prejudicial impact of Dr. Speth's objectionable testimony must be evaluated in light of the foregoing principles characterizing the State's burden of proof obligation, particularly whether defendant consciously disregarded a substantial and unjustifiable risk of death. Thus, an evaluation of prejudicial impact requires us to focus on whether Dr. Speth's testimony exceeded the scope of his expertise.

The New Jersey Rules of Evidence define the qualifications of persons permitted to give expert opinion testimony and provide for when such evidence is required. *N.J.R.E.* 702 provides that to be qualified as an expert, an individual must possess special "knowledge, skill, experience, training, or education." *Ibid.* Expert testimony is permitted only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Ibid.*

■ Generally, there are three basic requirements for the admission of expert testimony: "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony." *State v. Kelly,* 97 *N.J.* 178, 208, 478 *A.2d* 364 (1984); *N.J.R.E.* 702.

■ Dr. Speth was qualified only as an expert in forensic pathology. In that capacity, his testimony should have been limited to describing the physical properties of the implement that caused the Ballards' deaths, narrating the physiological status of the bodies at the time of death, and ruling out the possibility that the injuries were self-inflicted or sustained as a result of mere inadvertence. *See, e.g., State v. Chew,* 150 *N.J.* 30, 87, 695 *A.2d* 1301 (1997) (allowing medical examiner to testify that scratches on victim's face were caused while victim was either restrained or not moving and were not self-inflicted); *Gaido v. Weiser,* 227 *N.J.Super.* 175, 188, 545 *A.2d* 1350 (App.Div.1988) (noting that "medical examiners are uniquely situated to draw conclusions as to physiological causes of death"), *aff'd,* 115 *N.J.* 310, 558 *A.2d* 845 (1989); *People v. Reyes,* 879 *F.2d* 646 (9th Cir.1989) (finding forensic pathologist qualified to give opinion on position of victim's body at time he was shot); *United States v. Williams,* 36 *M.J.* 785 (U.S. Army Ct. of Mil. Rev.1993) (holding pathologist may testify to time of death and location of bruises); *Medlock v. State,* 263 *Ga.* 246, 430 *S.E.2d* 754 (1993) (holding trauma to baby's body was not consistent with accidental fall); *Boyce v. State,* 198 *Ga.App.* 371,

401 *S.E.*2d 578 (1991) (permitting testimony regarding relative height from which bullet was fired); *Kutscheid v. State,* 592 *N.E.*2d 1235 (Ind.1992) (permitting testimony regarding trajectory of bullet); *State v. Hicks,* 607 *So.*2d 937 (La.Ct.App.1992) (allowing testimony that bruise patterns were consistent with being struck with shoe); *State v. Vining,* 645 *A.*2d 20 (Me.1994) (holding testimony that victim's death was homicide went beyond medical examiner's expertise because there was no physical evidence to prove death was accidental); *State v. House,* 481 *A.*2d 1129 (Me.1984) (permitting testimony that angle of and trauma to bodies of two persons thrown from car can determine who was driving); *State v. Vestal,* 278 *N.C.* 561, 180 *S.E.*2d 755 (1971) (allowing testimony regarding lapse of time between victim's last meal and death); *Commonwealth v. Smith,* 511 *Pa.* 343, 513 *A.*2d 1371 (1986) (allowing testimony regarding caliber of bullet used to kill victim); *Commonwealth v. Guess,* 273 *Pa.Super.* 72, 416 *A.*2d 1094 (1979) (allowing testimony regarding location of bullet wounds and effect of such wounds on internal systems); *State v. Nazario,* 694 *A.*2d 666 (R.I.1997) (allowing testimony regarding distance of gun from victim's head); *State v. Triplett,* 187 *W.Va.* 760, 421 *S.E.*2d 511 (1992) (allowing testimony that it was impossible for knife wound to be accidental). A forensic pathologist's testimony is therefore restricted to describing the mechanics of death.

In *State v. Odom,* 116 *N.J.* 65, 77, 560 *A.*2d 1198 (1989), the Court reaffirmed that "[t]he determination of facts that serve to establish guilt or innocence is a function reserved exclusively to the jury. Hence, an expert's testimony that expresses a direct opinion that a defendant is guilty of the crime charged is wholly improper." *Ibid.*

As we previously noted, the jury was required to determine certain crucial facts before deciding defendant's guilt or innocence. Those facts were whether Ballard disobeyed the stop sign and whether defendant was operating his vehicle recklessly at the time of the collision. The ultimate factual-legal conclusion was whether

the collision was a "vehicular homicide" or a "vehicular accident." Dr. Speth was qualified only as an expert in forensic pathology and not qualified as an accident reconstruction expert. Yet he testified that the deaths were homicides, defendant was reckless, defendant's recklessness caused the deaths, and that Sandlier, who testified that Ballard did not obey the stop sign, was mistaken because she could not possibly have seen the stop sign from her position.

Although our rules of evidence permit a person not qualified as an accident reconstructionist to present some lay opinion evidence, most of the objectionable testimony did not comport with that rule. *N.J.R.E.* 701. There are two preconditions to the admission of such testimony: (1) the testimony must be "rationally based on the perception of the witness" and (2) the trial court must be satisfied that it "will assist in understanding the witness' testimony or in determining a fact in issue." *Ibid.;* *State v. LaBrutto, supra,* 114 *N.J.* at 197–200, 553 *A.*2d 335 (holding that police officer can testify as lay witness regarding point of impact based on personal observations at crash site).

First, Dr. Speth was not present at the time of the accident. Nor did he outline in detail the facts upon which his opinions that the accident was a homicide and that defendant was driving recklessly were based. He merely stated that "based on all the evidence, I reached the conclusion that this was a homicide." In response to the inquiry "Doctor, based on the facts as you saw them and determined them to be, would you characterize Mr. Jamerson's driving as reckless?," he answered "Yes" and continued by explaining that this response was based upon "personal observations at the scene and observations of the crash."

Second, Dr. Speth's experiences investigating over 40 fatal car crashes were based upon his statutory duty to "fully investigate the essential facts concerning the medical causes of death" in his capacity as a forensic doctor. *N.J.S.A.* 52:17B–87. During those investigations, he was engaged to determine the physiological

causes of the victims' deaths, not the causes of the accident to which he testified in the present case.

We reject the State's contention that because much of the objectionable testimony of Dr. Speth was introduced during the cross-examination, defendant invited the error. It was the State that initially elicited testimony from Dr. Speth that permitted him to say the crash was a homicide. Defense counsel conducted a proper cross-examination and had every right to assume that if a question required an answer beyond Dr. Speth's expertise, Dr. Speth would have declined to answer based on his lack of qualifications. Instead, Dr. Speth provided answers that exceeded his expertise and did not properly inform the jury that he was testifying as a lay person when he reconstructed the accident. In any case, as a lay witness, he could not testify regarding the way defendant operated his vehicle because such testimony was not rationally based on his perceptions. Consequently, the Court's statement about an overzealous expert witness in another case describes Dr. Speth in this case:

> An expert witness should distinguish between what he knows as an expert and what he may believe as a layman. His role is to contribute the insight of his specialty. He is not an advocate; that is the role of counsel. Nor is he the ultimate trier of the facts; that is the role of the jury or the judge, as the case may be. The trier of the facts may be misled if the expert goes beyond what he can contribute as an expert.
>
> [*In re Hyett*, 61 *N.J.* 518, 531, 296 *A.2d* 306 (1972)].

We are also satisfied that Dr. Speth should not have been permitted to testify that this was a reckless homicide rather than an accidental killing. First, that question was ultimately for the jury to decide. Second, under the evidence in this case, it was an issue on which an expert could not be of assistance to the jury. Here, there were no wounds to analyze. Instead, there were circumstances leading up to the accident that were within the understanding of the average juror. The jury was as competent as Dr. Speth to analyze the facts and determine whether the Ballards' deaths were the result of an accident or of defendant's recklessness. As the dissent in *Biro v. Prudential Insurance Co.*

expressed, permitting Dr. Speth to testify that the crash was a homicide or that defendant's driving was reckless "tends to mislead the jury into thinking that he knows something that they do not know." 110 *N.J.Super.* 391, 404, 265 *A.*2d 830 (App.Div.) (Matthews, J., dissenting), *rev'd* on the dissent, 57 *N.J.* 204, 271 *A.*2d 1 (1970). What Dr. Speth did know and the jurors did not were the physiological causes of the Ballards' deaths. Based on the evidence in this case, Dr. Speth was in no better position as a forensic pathologist to conclude that the collision was not an accident than the jurors themselves. Therefore, we conclude that Dr. Speth's testimony that the collision was not accidental was improperly placed before the jury.

We also agree with defendant that Dr. Speth's comment on the credibility of Sandlier's testimony that Ballard ran the stop sign was improper. It is well-settled that an expert may not testify regarding a witness's credibility. *State v. Michaels,* 136 *N.J.* 299, 323, 642 *A.*2d 1372 (1994); *State v. Abronski,* 281 *N.J.Super.* 390, 403, 657 *A.*2d 1224 (App.Div.1995), *aff'd,* 145 *N.J.* 265, 678 *A.*2d 659 (1996); *State v. J.Q.,* 252 *N.J.Super.* 11, 39, 599 *A.*2d 172 (App.Div.1991), *aff'd,* 130 *N.J.* 554, 578, 617 *A.*2d 1196 (1993); *State v. Gunter,* 231 *N.J.Super.* 34, 42, 554 *A.*2d 1356 (App.Div.), *certif. denied,* 117 *N.J.* 80, 563 *A.*2d 841 (1989). Experts may not offer such testimony because "credibility is an issue which is peculiarly within the jury's ken and with respect to which ordinarily jurors require no expert assistance." *J.Q., supra,* 252 *N.J.Super.* at 39, 599 *A.*2d 172. Moreover, the jury is charged with making credibility determinations based on ordinary experiences of life and common knowledge about human nature, as well as upon observations of the demeanor and character of the witness. *Ibid.* Additionally, Dr. Speth told the jury that the operator of the Ballard vehicle did not ignore the stop sign; that was ultimate-fact testimony prohibited by *Odom, supra.*

### III

Next, we focus on the jury instructions. The State argues that the trial court's instruction to the jury that they could

reject Dr. Speth's testimony was sufficient to cure any prejudice that may have resulted from the doctor's impermissible conclusions. We reject that argument.

*Odom, supra,* directs trial courts to

carefully instruct the jury on the weight to be accorded to and the assessment of expert opinion testimony. It should be emphasized that the determination of ultimate guilt or innocence is to be made only by the jury.

[116 *N.J.* at 82, 560 *A.*2d 1198.]

The trial court complied with that directive. That instruction, however, was not sufficient to overcome the prejudicial effect of Dr. Speth's statements. By definition, a jury cannot give the "proper" amount of weight to an expert's opinion when they labor under the erroneous assumption that the expert is testifying to an area within his expertise. Furthermore, " '[t]he aura of special reliability and trustworthiness surrounding expert testimony, which ought to caution its use, especially when offered by the prosecution in criminal cases, poses a special risk' " when it involves the question of a defendant's guilt. *State v. Odom,* 225 *N.J.Super.* 564, 571, 543 *A.*2d 88 (App.Div.1988), *rev'd on other grounds,* 116 *N.J.* 65, 560 *A.*2d 1198 (1989) (quoting *United States v. Brown,* 776 *F.*2d 397, 401 n. 6 (2d Cir.1985) (citations omitted)). This special risk arises " 'because the jury may infer that the [expert's] opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial.' " *Ibid.* In addition, this risk increases "when the opinion is given by 'the very officers who were in charge of the investigation.' " *Ibid.*

Viewing the extent of Dr. Speth's objectionable testimony in the context of the State's burden of proof, it can fairly be said that "the record had imprinted upon it a personal opinion which by its unique expression had a greater impact upon the jury's verdict than all the evidence proven in the whole trial by both the prosecution and defense." *State v. Landeros,* 20 *N.J.* 69, 75, 118 *A.*2d 521 (1955).

This is a tragic case. Two elderly people died as a result of the automobile collision. Nonetheless, the State had the burden of proving beyond a reasonable doubt that defendant recklessly caused their deaths. The State's evidence consisted mainly of defendant crossing double yellow lines to pass a vehicle turning right, driving with a blood alcohol level of .186, and not slowing from a lawful fifty miles-per-hour speed as he approached the intersection where the collision occurred. Defendant insists that none of this caused the deaths but rather that Mr. Ballard's failure to stop and yield at the stop sign was the cause of the accident. Given the contested evidence in the case, the prejudicial impact of the objectionable testimony of Dr. Speth cannot be regarded as harmless error.

Finally, the trial court's erroneous reinstruction of the jury regarding the difference between manslaughter and death by auto was prejudicial to defendant. The reinstruction informed the jury that the additional acts of recklessness required for manslaughter beyond defendant's reckless driving may be satisfied by "a combination of the recklessness in driving and another one or more acts of recklessness." Rather than combining the reckless driving with other acts of recklessness, the jury should have been told that the additional conduct had to be independent of the reckless driving. The error was prejudicial because it not only lessened the State's burden of proof, but it also made Dr. Speth's conclusion that this was reckless manslaughter more plausible.

## VI

We conclude that the numerous errors committed in the trial court had the clear capacity to produce an unjust result. *State v. Marrero*, 148 *N.J.* 469, 494–95, 691 *A.*2d 293 (1997); *State v. Jordan*, 147 *N.J.* 409, 422, 688 *A.*2d 97 (1997); *State v. Macon*, 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971); *R.* 2:10–2. If the jury was guided improperly either to reject the defense that Ballard disobeyed the stop-sign law, or to conclude that defendant recklessly caused the collision, those errors were "sufficient to raise a

reasonable doubt as to whether [they] led the jury to a result it otherwise might not have reached." *Macon, supra,* 57 *N.J.* at 336, 273 *A.*2d 1.

We reverse both reckless manslaughter convictions and remand the matter to the Law Division for retrial.

*For reversal and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.