**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2381-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

NAKIRA M. GRINER, a/k/a
NAKIRA M. JAMES,

    Defendant-Appellant.

_____

Argued January 14, 2025 – Decided June 16, 2025

Before Judges Sumners, Susswein and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 19-06-0537.

Zachary G. Markarian, Assistant Deputy Public Defender, argued cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Zachary G. Markarian, of counsel and on the briefs).

Robert A. Polis, II, Assistant Prosecutor, argued the cause for respondent (Jennifer Webb-McRae, Cumberland County Prosecutor, attorney; Jeffrey

Krachun, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

This appeal arises from the horrific death of twenty-three-month-old Daniel Griner, Jr. A jury found defendant Nakira M. Griner, Daniel's mother, guilty of first-degree murder, N.J.S.A. 2C:11-3(a)(1); second-degree desecration of human remains, N.J.SA. 2C:22-1(a)(2); fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(1); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2); and second-degree false public alarm, N.J.S.A. 2C:33-3(a)(1). Following merger, defendant was sentenced to an aggregate life sentence, plus a consecutive seven-year term.

Defendant appeals, arguing:

> POINT I
>
> THE COURT ERRED IN ADMITTING DR. MAZARI'S CONCLUSION THAT THE MANNER OF DEATH WAS "HOMICIDE" WHERE THAT CONCLUSION WAS NOT BASED ON HIS MEDICAL EXPERTISE BUT DEPENDED ENTIRELY ON EVIDENCE DIRECTLY WITHIN THE JURY'S KEN.
>
> POINT II
>
> THE COURT ERRED IN ADMITTING UNRELIABLE EXPERT TESTIMONY REGARDING THE TIMING OF THE SKELETAL INJURIES

WHERE THE COURT DID NOT FIND – AND THE STATE PRESENTED NO EVIDENCE ESTABLISHING – THAT SUCH TESTIMONY WAS GENERALLY ACCEPTED AS RELIABLE UNDER FRYE.[1]

POINT III

THE COURT VIOLATED [DEFENDANT'S] JURY TRIAL RIGHTS BY DISQUALIFYING JUROR 115 BASED ON A 21-YEAR-OLD CONVICTION FOR A "CDS CHARGE" WITHOUT DETERMINING IF THAT CONVICTION ACTUALLY DISQUALIFIED HIM FROM SERVING OR IF IT HAD BEEN EXPUNGED.

After considering the parties' arguments, the record, and applicable law, we affirm defendant's convictions.

I.

A.

Daniel Jr.'s Death

On February 8, 2019, at approximately 6:30 p.m., the Bridgeton Police Department (BPD) received a distress call from defendant.  Police Officer David Ringer responded to the call, meeting defendant, who had her infant son Jayce[2]

---

[1]  Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

[2]  The parties' briefs and the record also interchangeably spell his name "Jace." For consistency, we will use "Jayce."

with her, at the intersection of Giles and New Streets. Defendant related that she was walking from her home to a nearby Walgreens when unknown assailants pushed her from behind and took her baby stroller carrying Daniel Jr.

After additional officers responded to search the area for Daniel Jr., they found an empty baby stroller lying on its side with toddler shoes nearby a few streets away. Approximately fifty police and fire department personnel, including a K-9 handler with a bloodhound, proceeded to search the area. State police were contacted to provide a helicopter equipped with a heat-seeking camera to aid in the search. The police confirmed that Daniel Sr., the baby's father and defendant's husband, was at work when defendant reported the kidnapping.

Sergeant Michael Pastirko and Detective Richard Morris went to defendant's home in case Daniel Jr. returned there. They found it odd that the house windows were open and a ceiling fan was on because it was "blistering cold" that night. According to Sgt. Pastirko, the home was tidy but had a "[v]ery pungent" odor. With defendant's consent, police thoroughly searched the house, backyard, and adjacent woods but were unable to locate Daniel Jr.

Detective Sergeant Kenneth Leyman, sensing the "chemical" odor was strongest in the kitchen, looked in the oven and saw a tray of what appeared to

be store-bought cookies.  He observed the oven's bottom was clean, but that both sides were grease-spattered.  He found burnt Clorox wipes in the kitchen trashcan, concluding they were causing the odor in the house.  Red and blue candles were also noticeable in the house.

Outside the house, Sgt. Pastirko spotted a large Hello Kitty purse weighing ten to fifteen pounds in a shallow hole next to the shed in the backyard.  Upon cursory inspection of the purse, Sgt. Pastirko saw what he thought to be a piece of cooked meat placed inside multiple white plastic trash bags.  Thinking nothing of it, he put the purse aside.

Around the same time, Detective Mark Yoshioka retrieved surveillance camera footage from homes along defendant's route to Walgreens showing her carrying Jayce and pushing an empty stroller prior to the alleged kidnapping.  About twenty minutes later, another surveillance camera captured defendant walking back the other way without the stroller.  After this information was relayed to the police at defendant's home, Det. Sgt. Leyman and Officer Brent Bodine reexamined the contents of the Hello Kitty purse.  They then realized that what was originally believed to be a piece of burnt meat was in fact the burnt, mostly skeletal remains of a child.  Dried red and blue candle wax was found on some of the remains.  DNA testing later revealed the remains were of

5

Daniel Jr. Defendant was subsequently charged with murdering her son and other related offenses.

B.

<u>Defendant's Explanation of Her Son's Death</u>

Defendant did not testify or present any witnesses at the trial. The State, however, presented audio of her recorded phone calls from jail with her sister LaShae Trussell on three separate calls a month after Daniel Jr.'s death; with Daniel Sr. on March 5; and with a person identified only as Alexis on an unspecified date. The calls revealed defendant's explanation of how Daniel Jr. died.

Sergeant Ryan Breslin of the Cumberland County Prosecutor's Office, with defendant's consent, extracted data from defendant's phone using software which generated a report of the phone's call/text message logs and internet browsing history. The report revealed: (1) an eight-day gap in the phone's internet browsing history between 4:19 p.m. on January 31, 2019 through 2:33 a.m. on February 8, 2019; (2) a gap in the call/text message history between 3:09 p.m. on January 16, 2019 through 6:43 a.m. on February 8, 2019; and (3) certain files on the phone were "modified" on February 7, 2019.

6

Sgt. Breslin noted that, on February 8, 2019, the date of Daniel Jr.'s death, defendant accessed the internet at least ninety-nine times starting at 7:24 a.m. Her searches included tracking delivery of a package and visiting shopping sites for purses and shoes. She also searched for information about how to know when a baby has a chest cold.

In defendant's telephone call with Trussell, defendant said Daniel Jr. fell down the stairs while reaching for a doll. His breathing initially "sounded a little weird" but thereafter his breathing and behavior were normal. When he vomited later that day, defendant attributed it to him eating too much. Defendant said he seemed tired well before his usual 8:00 p.m. bedtime. When she woke him up the next morning, he was "gone." She was unable to resuscitate him using CPR. Upon searching the internet regarding his symptoms and considering what happened the day before, defendant concluded he may have died from internal bleeding resulting from his fall. Realizing that Daniel Jr. was dead, defendant told Trussell she panicked—"all rationality, all common sense, . . . everything left"—because her son had "bruises on him" from being beaten by her and Daniel Sr. She thought the police would assume they had beaten their son to death, and that they would both be arrested and lose custody of

7

Jayce. She therefore decided to cover up Daniel Jr.'s death to make sure that Daniel Sr. and Jayce would remain together.

In her telephone call with Daniel Sr., defendant said: (1) she did not kill Daniel Jr. or do anything to hurt him; (2) she destroyed Daniel Jr.'s remains because she did not want Daniel Sr. to get in trouble for "what we were doing to Daniel [that] left marks all over his little butt and all over his legs"; (3) that things would have been worse for everybody if the authorities had seen Daniel Jr.'s bruises; and (4) she did what she did so that Daniel Sr. and Jayce could remain together.

And in defendant's call with Alexis, she claimed that, if she had not sacrificed herself, "then Jayce w[ould] have nothing and that's the most important part, like I did it for Jayce because, if Daniel [Sr.] loses everything, then Jayce loses everything." She said, "Daniel [Sr.] never wanted to hit Daniel [ Jr.]. He never wanted to discipline him. I made him [do so] because I didn't wanna be the only one." Because of this, she voiced, "I felt like I had to do what I did to save . . . [Daniel Sr. and Jayce] from losing everything the same way that I did."

A-2381-22

## C.

### State's Expert Testimony

Pretrial Motions

Prior to trial, defendant moved to exclude expert testimony from forensic anthropologist Evan Bird as to whether Daniel Jr.'s skeletal fractures occurred antemortem (before death), perimortem (around the time of death), or postmortem (after death). Defendant argued Bird's opinion that Daniel Jr.'s fractures were perimortem injuries was too vague to support the State's homicide charge and thus, too prejudicial to be admitted.

During an N.J.R.E. 104 hearing, Bird, who is employed by the Chief State Medical Examiner's Office and teaches at Rutgers University, discussed his education and academic honors, and stated he was one of only two forensic anthropologists in New Jersey. He participated in dozens of bone trauma analyses involving thermal damage and had previously been qualified as an expert in forensic anthropology. Bird related that as a diplomat of the American Board of Medicolegal Death Investigators, he was acquainted with forensic anthropologists across the country and familiar with research being performed in his field.

A-2381-22

Bird testified he relied upon scientific principles and acceptable methods used in the anthropological community in performing his forensic analysis of Daniel Jr.'s remains. He stated, "the entire [analysis] was based on the kind of standard [f]orensic [a]nthropological examination one would do in a case where what we refer to as, 'Trauma Anthropology,' is the concern." He detailed the forensic analysis he performed and explained his conclusions. Following Bird's testimony and the parties' arguments, the trial court denied defense counsel's motion. In its oral decision, the court highlighted Bird's professional credentials, employment history, experience with thermal bone injuries and prior qualifications as an expert in court. The court discussed Bird's painstaking analysis of the child's remains and his acknowledgement of certain limitations of that analysis. The court continued:

> And he's drawing his conclusions because this is what he does for a living, and this is the science behind what he does. They know the science. They know that these types of fractures occur in a certain fashion. They know based on the age that this is what it is.
>
> . . . .
>
> So he described everything that he needed to, and it seems reliable. I mean, I don't have anything before me to show me that this type of methodology that he used is not the proper way that forensic anthropologists work. I mean, this is what he does for a living. . . .

10

So[,] the <u>Daubert</u>[3] analysis.  When a proponent does not demonstrate the soundness of a methodology — he demonstrated the soundness. . . . [I]t's pretty . . . self-evident, both in terms of its approach to reasoning and to its use of data from the perspective of others within a relevant scientific community.

The gatekeeper should exclude the proposed expert testimony on the basis that it's unreliable.  I don't have that in front of me.  I have . . . a very good, sound scientific method on what it is that he does, and what the limits are of the science behind what it is.  And he discussed that at length, antemortem, perimortem, and postmortem, and how it is that they draw their conclusions.

    . . . .

This expert['s] . . .  opinion[,] I'm certainly going to allow in before the jury.

Defendant also moved to bar the State's Medical Examiner and forensic pathologist Peter Mazari, M.D. from testifying that Daniel Jr.'s death was a homicide because it would be cumulative to Bird's testimony and unduly prejudicial as neither Dr. Mazari nor Bird could definitively say that the fractures occurred prior to Daniel Jr.'s death.  Defendant also argued that Dr. Mazari's opinion was improperly based solely upon the circumstances of the case, not his medical expertise.

---

[3]  <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993).

A-2381-22

During the N.J.R.E. 104 hearing, Dr. Mazari detailed his autopsy of Daniel Jr.'s remains and explained why he needed Bird's findings to determine whether the fractures occurred antemortem or postmortem. He testified that based on Bird's findings regarding the timing of the fractures, he concluded that Daniel Jr. had died from injuries resulting from blunt force trauma and that the manner of his death was homicide. The trial court denied defense counsel's motion, ruling: (1) Dr. Mazari's testimony would not be cumulative to Bird's testimony because they played separate, though related, roles in the investigation, and each had something different to offer as to the various counts in the indictment; and (2) the challenges made to Dr. Mazari's opinions went to the weight rather than the admissibility of those opinions and could be addressed on cross-examination.

Dr. Peter Mazari's Trial Testimony

At trial, Dr. Mazari testified as an expert involving blunt force trauma and thermal alteration. He performed an autopsy on Daniel Jr.'s remains four days after his death without knowing it was Daniel Jr. because the remains were "not visually identifiable." He explained that most of the skin had been burned away and that the remaining underlying soft tissue was extremely altered by thermal

A-2381-22

damage. Most of the tissue was not recognizable, and what was recognizable was "severely different than what it would have been in its native state."

Dr. Mazari identified numerous bone fractures, including seventy-four in the cranium; several in the right ribs; one in the left ribs; three bones in the left arm (humerus, radius, and ulna); and three bones in the left leg (femur, tibia, and fibula). He further noted Daniel Jr.'s left foot was detached at the ankle. He was unable to determine whether the bone fractures occurred antemortem or postmortem because of the severe damage to the remaining soft tissue by thermal alteration. He thus sought assistance from Bird to properly desiccate and examine the skeletal remains and to opine as to the timing of the fractures and whether any were caused by thermal exposure.

Based on Bird's findings, Dr. Mazari opined that Daniel Jr.'s stellate right parietal skull fracture, multiple left-sided rib fractures, and fracture of the left humerus were "likely perimortem," occurring shortly before, after, or within a day of, his death. He explained his conclusion was "likely" because that was Bird's phrasing. He posited the stellate skull fractures were "more common with inflicted trauma" and "uncommon with any kind of accidental trauma." According to Dr. Mazari, "injuries that occur at home are usually linear skull fractures, if there's any skull fracture. Most accidents inside the house for a

toddler don't result in any significant injuries." He surmised there was probably no blood at the scene because the fracture did not break the skin which was often the case with blunt injuries.

Dr. Mazari acknowledged that, while he identified the fractures in Daniel Jr.'s bones in his autopsy, he relied exclusively on Bird's findings regarding the timing of the fractures. He denied he "predominantly" based his opinion as to manner of death on Bird's findings. Rather, he stated that the suspicious circumstances in this case "played a very large role . . . in the ruling of homicide," in the "absence of another more plausible cause of death." He maintained that Bird's findings played "a more predominant role in the cause of death, but less so in the manner of death," because Bird "put the blunt force injuries within a proper window of time [so] as to be the potential cause [of death]."

In sum, Dr. Mazari opined that Daniel Jr.'s death was caused by "injuries including blunt force trauma" and that the manner of Daniel Jr.'s death was homicide based upon: (1) the suspicious circumstances of the case, including the severe damage to his remains and the placement of those remains in the purse outside the home; (2) the multiple areas of bone fractures, some of which were determined to be perimortem and, thus, a possible cause of death; (3) the

potentially-fatal nature of the perimortem stellate skull fracture; and (4) the fact that the stellate skull fracture was not "compatible with a simple fall down stairs."

Evan Bird's Trial Testimony

Bird performed trauma analyses of skeletons and other hard tissues of the body. Upon receiving Daniel Jr.'s remains from Dr. Mazari, Bird meticulously cleaned the bones and rearticulated (reassembled) the skeleton. After taking forty hours to put just the skull back together, albeit missing some fragments, he observed that there were multiple non-thermal blunt force fractures to both sides and the back of the head. This caused plastic deformity in the cranial bones, preventing them from fitting perfectly together, while thermal trauma caused charring. The skull damage was inconsistent with brittle bones, crush injuries, or a fall from great height.

Bird opined that a stellate fracture was a "red flag" for child abuse because it was very difficult for a child to accidentally injure themself in this way. He explained that stellate fractures were usually seen only in car accidents or violent attacks. He determined the fracture was perimortem, rather than antemortem or postmortem, because: (1) it showed no signs of healing as an antemortem fracture would; and (2) the deformation in the bone indicated that the bone tissue

was still alive when the injury occurred. Bird stated that Daniel Jr.'s multiple left rib fractures resulted from a single blunt force impact and were also perimortem, with no sign of healing, and the charring to the inside of the ribs indicated that they were fractured before they were burned. He noted that postmortem alteration of a bone usually results in the bone having a frayed appearance or crumbling at the fracture site. Bird also believed the left humerus fracture was likely perimortem, evidenced by the charring to the inside of the bone. He acknowledged he could not determine the timeframe of the remaining fractures to the right-side rib, leg, and arm, although none of them showed signs of healing indicative of antemortem injury.

## D.

### Jury Voir Dire & Verdict/Sentencing

Following a colloquy with potential juror 115 during voir dire, the trial court disqualified the juror under N.J.S.A. 2B:20-1(e) because of his approximately twenty-one-year-old controlled dangerous substance (CDS) conviction. Before disqualifying the potential juror, the court declined defendant's request that he be asked whether his conviction, which the juror stated resulted in a prison term, was expunged because it believed the inquiry was impermissible. Individuals with expunged convictions are allowed to serve

16

on a jury. In re D.J.B., 216 N.J. 433, 441 (2014). Nevertheless, after advising the potential juror he was excused, the juror intimated his conviction was not expunged by asking the court: "Could I ask you one question. Do you offer any expunge reports, and I know I'm off-base, but do we have any of that in Cumberland County?" The court responded: "If you . . . contact . . . the trial court administrator . . . there are seminars being set up at different places throughout the county."

Defendant was thereafter tried over the course of six days. The jury found her guilty on all charges: first-degree murder; second-degree desecration of human remains; fourth-degree tampering with physical evidence; second-degree endangering the welfare of a child; and second-degree false public alarm.

At sentencing, over six weeks later, after merging the endangering the welfare of a child conviction into the murder conviction and the tampering with physical evidence conviction into the desecration of human remains conviction, the trial court sentenced defendant to: life imprisonment without eligibility for parole for murder; a consecutive seven-year term of imprisonment on desecration of human remains; and a concurrent five-year term of imprisonment on false public alarm.

II.

Defendant's first argument before us is that the trial court erred in allowing Dr. Mazari to testify that the manner of Daniel Jr.'s death was "homicide" because it was not based on his medical "judgment or expertise" but "depended principally, if not entirely, on the circumstances in which Daniel, Jr.'s body was disposed." Citing State v. Jamerson, 153 N.J. 318, 340-41 (1998), defendant posits "[t]he jury was 'as competent as' Dr. Mazari to analyze these facts and reach a conclusion as to the ultimate issue in the case." We are unpersuaded.

Expert testimony is permissible where a jury needs someone with "scientific, technical, or other specialized knowledge [to] assist the trier of fact to understand the evidence or to determine a fact in issue," N.J.R.E. 702, that "is so esoteric that jurors of common judgment and experience cannot form a valid judgment," Scully v. Fitzgerald, 179 N.J. 114, 127 (2004) (internal quotation omitted). Thus, expert testimony is admissible where: (1) the subject matter is beyond the ken of the average juror; (2) the testimony and underlying foundation are reliable; and (3) the witness has sufficient expertise. State v. Olenowski, 253 N.J. 133, 143 (2023) (internal citation omitted).

The court did not abuse its discretion in allowing Dr. Mazari to opine Daniel Jr.'s death was a homicide. See Townsend v. Pierre, 221 N.J. 36, 52

18

(2015) (holding the decision to admit or exclude expert testimony is within the sound discretion of the trial court). We acknowledge that Dr. Mazari's opinion relied upon the suspicious circumstances of defendant's false kidnapping distress call to law enforcement and the horrendous desecration and concealment of Daniel's Jr.'s body. However, taken as a whole, his ultimate determination that Daniel Jr. was the victim of a homicide was also based on medical findings that were well beyond the ken of the jury. For example, the "very large role" of Bird's findings that the potentially fatal nature of the perimortem stellate skull fracture, which was not "compatible" with an accidental fall down the stairs, together with the multiple perimortem bone fractures, were medical findings outside the jury's ken.

We add that defendant's reliance upon State v. Jamerson is misplaced. There, the main issue was whether the defendant's driving in a fatal car accident satisfied the recklessness standard for purposes of a second-degree reckless manslaughter charge. Jamerson, 153 N.J. at 324. Over a defense objection, the medical examiner, who was not an accident reconstructionist, opined the victim's death was due to vehicular homicide rather than an accidental death based upon eyewitness statements describing the circumstances of the accident. Id. at 330-33. The Supreme Court reversed the defendant's conviction, ruling

19

the medical examiner was not qualified as an expert or lay person to assess the way the defendant drove his vehicle and the cause of the accident, and the medical examiner's testimony should have been limited to the physiological cause of the victim's death, including ruling out other possible causes of death. Id. at 324, 337-42. Here, in stark contrast to the situation in Jamerson, Dr. Mazari's opinion focused on the physiological cause of the toddler's death based on a painstaking examination of the remains.

Defendant's reliance on several out-of-state cases, State v. Sosnowicz, 270 P.3d 917 (Ariz. Ct. App. 2012), Bond v. Commonwealth, 311 S.E.2d 769 (Va. 1984), People v. Eberle, 697 N.Y.S.2d 218 (N.Y. App. Div. 1999), and State v. Tyler, 867 N.W.2d 136 (Iowa 2015) is also misplaced. Like Jamerson, those cases involved medical examiners' testimony that the victim's manner of death was based solely on non-medical evidence, such as witness statements, that was equally available to the jury, rather than medical expertise. See Sosnowicz, 270 P.3d at 922-23; Bond, 311 S.E.2d at 772; and Eberle, 697 N.Y.S.2d at 219; and Tyler, 867 N.W.2d at 144.

Our review of the record indicates Dr. Mazari's opinion that Daniel Jr.'s death was due to homicide was based upon medical findings which were beyond the average ken of the jury. This opinion directly refuted defendant's claim that

20

Daniel Jr. died from a head injury sustained after accidentally falling down the stairs, coupled with defendant's desecration and hiding of Daniel Jr.'s remains.

III.

Defendant next argues the trial court erred in admitting Bird's "unreliable" expert testimony as to the timing of Daniel Jr.'s skeletal fractures. Defendant insists that, rather than holding the State to its burden, the trial court erroneously relied upon Bird's credentials, his employment history, and the absence of anything indicating that his methodology was improper, in determining his forensic analysis was generally accepted as reliable among forensic anthropologists. We are unpersuaded.

When the case was tried, admission of expert testimony was controlled by the standard established in Frye, rather than the standard in Daubert.[4] "The Frye test requires trial judges to determine whether the particular science underlying the proposed expert testimony has 'gained general acceptance in the particular field in which it belongs.'" State v. Pickett, 466 N.J. Super. 270, 302 (App. Div. 2021) (quoting Frye, 293 F. at 1014). Whereas the Daubert test requires a trial

_____

[4] Our Supreme Court recently held that, "going forward," the standard for scientific reliability set forth in Daubert, not the "more restrictive" standard set forth in Frye, should apply to "the admissibility of expert evidence in criminal and quasi-criminal cases." Olenowski, 253 N.J. at 139.

judge reviewing a proffer of expert scientific testimony to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Olenowski, 253 N.J. at 147 (quoting Daubert, 509 U.S. at 592-93).

Based upon our de novo review of a trial court's admission of scientific evidence, State v. Rochat, 470 N.J. Super. 392, 436 (App. Div. 2022), we are satisfied that the methodology used by Bird was generally accepted in the field of forensic anthropology. The State made a prima facie showing that Bird's expert testimony was based on well-established scientific theories and tests, State v. Harvey, 151 N.J. 117, 167 (1997), and defendant did not present "sufficient evidence to call into question" its admissibility, Rubanick v. Witco Chem. Corp., 125 N.J. 421, 426 (1991). Bird's testimony regarding the timing of Daniel Jr.'s skeletal fractures was supported by his academic credentials, employment history, and knowledge of nationally accepted forensic anthropology analytic techniques. Moreover, as the State notes, one of the articles defendant appended to her motion brief in support of her position actually confirms that the methodology employed by Bird was widely accepted

in the scientific community at the time of his examination.  The trial court did not err in admitting Bird's testimony.

## IV.

Finally, defendant contends the trial court's error in disqualifying the potential juror without asking him if his CDS conviction was expunged violated her constitutional right to an impartial jury.  The argument requires little discussion in a written opinion.  R. 2:11-3(e)(1)(E).  As noted, a person with an expunged conviction can serve as a juror.  D.J.B., 216 N.J. at 441.  However, defendant fails to point to any legal authority requiring a trial court to ask the potential juror if his conviction was expunged.  The case law defendant cites does not address whether a trial court must probe further when a potential juror self-reports that they are disqualified from service due to a prior conviction for an indictable offense per N.J.S.A. 2B:20-1(e). While the court had the discretion to ask the juror if  his record was expunged, based upon the juror's own question to the court about expungement, it appears his record was not expunged.  Lastly, defendant proffers no indication how she was prejudiced by the potential juror's disqualification.  Her suggestion that she need not show prejudice in order to establish her right to an impartial jury was denied is unsupported by any legal standard.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M. C. Harley*

Clerk of the Appellate Division

A-2381-22