# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2310-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

G.W.,[1]

     Defendant-Appellant.

_____

Submitted September 15, 2021 – Decided October 7, 2021

Before Judges Messano and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 16-06-1772.

Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).

Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Linda A. Shashoua, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

---

[1] We use initials to protect the privacy of the victim and pseudonyms for ease of reference. See R. 1:38-3(c)(9); see also N.J.S.A. 2A:82-46.

PER CURIAM

Tried to a jury, defendant G.W. was convicted of sexually assaulting and endangering the welfare of his step-granddaughter, T.S. (Tess), on six occasions when the child was between the ages of nine and twelve.[2] During the five-day trial, the State presented the testimony of Tess; her mother and sister, who both testified as fresh-complaint witnesses;[3] the lead detective, through whom defendant's largely exculpatory statement was introduced in evidence; and Stephanie Lanese, M.D., who testified as a lay witness. Dr. Lanese's physical examination revealed no evidence of injury; she opined that Tess had been sexually abused based on the child's account of the incidents.

Defendant did not testify but presented the testimony of his wife and three character witnesses. The parties stipulated that preliminary testing performed on Tess's bedding and clothing "resulted in no additional examination or testing, including any DNA or DNA comparisons." The jury deliberated over the course

---

[2] Defendant was charged in an eight-count Camden County indictment with six counts of second-degree sexual assault by sexual contact on a victim who was less than thirteen years old when the defendant was at least four years older, N.J.S.A. 2C:14-2(b) (counts one, two, three, five, six, and seven); and two counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (counts four and eight).

[3] Defendant does not challenge their fresh complaint testimony on appeal.

2

of two trial days, during which they requested playback of defendant's one-hour-and-twenty-minute statement.

The court imposed six consecutive six-year prison sentences for an aggregate term of thirty-six years, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.  Defendant was sixty-four years old at the time of sentencing.  He had no prior criminal record.

Defendant now appeals, raising the following points for our consideration:

POINT ONE

THE TESTIMONY OF DOCTOR STEPHANIE LANESE EXCEEDED THE SCOPE OF PROPER LAY OPINION AND CONSTITUTED IMPROPER EXPERT OPINION.
(Not raised below).

POINT TWO

THE TESTIMONY OF DOCTOR STEPHANIE LANESE CONSTITUTED IMPROPER FRESH COMPLAINT TESTIMONY WHICH DENIED DEFENDANT A FAIR TRIAL.
(Not raised below).

POINT THREE

THE TRIAL COURT WRONGFULLY DENIED DEFENDANT'S MOTION FOR A NEW TRIAL.

A-2310-18

POINT FOUR

THE AGGREGATE SENTENCE OF 36 YEARS
WITH A PAROLE DISQUALIFIER OF 30.6 YEARS
IS AN EXCESSIVE SENTENCE.

Because the testimony of Dr. Lanese exceeded the bounds of lay witness testimony and improperly opined on defendant's guilt, we are constrained to reverse defendant's convictions and remand for a new trial. In view of our decision, the sentencing arguments raised in point four are rendered moot.

I.

Tess was fourteen years old and living with her mother when she testified. At age three, Tess was placed with her maternal grandmother and defendant – her mother's adoptive father – because her mother was addicted to drugs and alcohol. Tess lived with her grandparents until age twelve, when she reported defendant's misconduct. She referred to defendant as "Pop" and her grandmother as "Mom-Mom."

Tess described defendant's increasing physical and sexual advances while living in her grandparents' home. At age seven, defendant began "wrestling" with Tess, which included punching her ribs and throwing her onto her bed. Two years later, defendant began touching her private parts.

During the first incident, defendant woke Tess, "climbed into bed with [her]" and "started rubbing her thigh . . . [t]owards her vagina." Stopping short of touching Tess's vagina, defendant told Tess: "Do not tell anyone or I'll hurt Mom-Mom." After the prosecutor refreshed Tess's recollection with her sworn statement to police, Tess told the jury that on another night, defendant "forced [her] hand down his pants." Defendant's penis felt like a "snail" because it was "[s]oft and spiny." On another occasion, defendant manually touched Tess's vagina through her underwear.

In April 2015, when she was eleven years old, Tess and her grandparents moved to another municipality in Camden County. One month later, defendant woke her, stating: "Here we go at it again." Defendant touched Tess's thigh and breast under her shirt. Later that summer, defendant laid on top of Tess, and "made a . . . wave motion" with his body causing pain to her stomach. Defendant's pants were down, and his penis touched her vagina through her underwear. Tess said she was taken to the hospital sometime thereafter. The last incident occurred in December 2015. On that occasion, Tess was lying face down in bed, when defendant entered her bedroom, and made the "wavy motion," touching her buttocks with his exposed penis.

5

During the incidents, defendant never attained an erection or ejaculated, and his bare penis never touched her bare vagina. Tess told the jury defendant said, "[h]arder, harder," when he laid on top of her "doing that wavy motion."

On December 18, 2015, the day after the final incident, Tess reported the abuse while visiting her maternal aunt's home. Tess's mother, sister, and cousin also were present. While they were wrapping Christmas gifts, her aunt asked Tess whether anything was "going on" between her and defendant. Tess explained that her aunt had noticed "whenever she was around, [Tess] would always sit on [defendant's] lap." Tess told her aunt she did so because defendant wanted her to show him affection and would threaten to hurt her grandmother if she did not comply. After "[t]hey kept asking [her] the same question over and over again," Tess disclosed the abuse.

In the early morning hours of December 19, 2015, defendant responded to police headquarters. After waiving his Miranda[4] rights, defendant gave a voluntary statement to police, vehemently denying he ever touched Tess inappropriately, sexually or physically.

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966). Following an N.J.R.E. 104(c) hearing on the State's application, the trial court admitted defendant's statement in evidence. Defendant does not challenge that ruling on appeal.

Defendant, however, acknowledged he suffered from erectile dysfunction (ED) for "about three or four years."  He told the detective only his wife knew about his ED and he only got "a hard one . . . [o]nce in a while."  Defendant stated he took medication the previous night and attempted to make love to his wife but he "couldn't stay hard enough."  When the detective told defendant Tess described defendant's penis as "limp" and "wiggl[ing] around," defendant repeatedly maintained he "never did nothing to her."  Defendant did not know how Tess would know about his ED.  At the conclusion of the statement, he consented to a DNA sample by buccal swab.

Dr. Lanese was the State's fifth and final witness.  At the time of trial, Dr. Lanese was employed by Rowan University at the Child Abuse Research Education and Service (CARES) Institute as a physician and an Assistant Professor of Pediatrics.  The CARES staff, which is comprised of multiple physicians, psychiatrists, psychologists, nurses, medical assistants, and research assistants, care for "any child where there is a concern for abuse or neglect in the seven southern counties of New Jersey."  CARES professionals "provide the medical evaluation for the child" then "come up with a diagnosis and . . . determine treatment for that child."

7

Although the State did not move to qualify Dr. Lanese as an expert witness, the prosecutor elicited detailed testimony from the doctor about her educational background, affiliations with professional societies, and teaching experience. Dr. Lanese testified that she was board certified in pediatrics and child abuse pediatrics.

Dr. Lanese explained that "typically" children suspected of child abuse are treated at the CARES Institute following a referral from the Division of Child Protection and Permanency (DCPP), a prosecutor's office, a hospital, "or a pediatrician in the outside community." A history and medical history are then taken from the person who brought the child to the CARES Institute. A "history" of the child's "illness," which Dr. Lanese described as "symptoms, experience" are subsequently taken from the child, the results of which dictate the type of physical examination that follows. The purpose of the examination is "for diagnosis and treatment."

On December 28, 2015, ten days after the final incident, Tess was examined at the CARES Institute. Dr. Lanese testified that before speaking with Tess, the child's mother "indicated . . . that [Tess] was living with her grandmother and her step-grandfather and she would visit with mom."

The following exchange ensued:

8

[PROSECUTOR:] Okay. And in the course of obtaining the history from T[ess,] did you ask her specific questions about what was going on in the household?

[DR. LANESE:] Yes.

[PROSECUTOR:] Okay. And what did she tell you?

[DR. LANESE:] She indicated to me that her grandfather had done something to her. She did not indicate that it was her step-grandfather, just her grandfather. And she indicated, after I asked some further questions on what he was doing, she indicated that about a week before her seventh birthday he had come in her room, lifted her covers and got in bed with her and put his hand on her inner thigh. And she said it progressed from there. It included that he would take off her pants, lay on top of her and his private part would touch her underwear. She indicated that it was his bare private, his bare penis was out. She also then indicated at least one time where her underwear was also taken off and his private was on her private. She indicated that he also put his hand on top of her private. She indicated that he kissed her neck. And she also indicated that he was physically abusive towards her.

[PROSECUTOR:] And in what way?

[DR. LANESE:] She said that he would fake wrestle with her, which then would lead to punching, but at other times he even punched an area of her body that already had a small injury and made it worse.

[(Emphasis added).]

A-2310-18

The prosecutor also asked Dr. Lanese whether her assessment included "how" Tess "came forward" about the abuse. Dr. Lanese told the jury:

> Yes, she said that she was told that in order to make it stop, something stop, that she needed to tell about it and she really had always wanted to tell and she always wanted it to stop.

The questioning continued:

> [PROSECUTOR:] At some point do you ask patients generally about fault, whether they think it's their fault, the child?
>
> [DR. LANESE:] Yes, the first question I usually ask is who do they think is at fault so that I can find out who the child believes did this to them.
>
> [PROSECUTOR:] Let me interrupt just quickly. Why do you ask who the child thinks is at fault?
>
> [DR. LANESE:] Because, unfortunately, a lot of children are led to believe that this is their fault, that they are somehow culpable, that they did something wrong and many of them think that they participated in this event and, therefore, did something wrong and are going to get in trouble. Many of them do not tell because of that fear and that shame that this is their fault. And so understanding that helps us to determine if they need further treatment because that is something that they can carry around for a long time.
>
> [PROSECUTOR:] And you asked this question of T[ess]?
>
> [DR. LANESE:] I did. <u>When I asked her who she felt was at fault, she indicated that it was her grandfather</u>.

10

[(Emphasis added).]

Turning to the child's physical complaints, Tess also told Dr. Lanese about two prior ailments: a "tingling, stinging sensation" in her "private part" when she was younger, which Tess attributed to "him"; and a ruptured ovarian cyst that occurred the day after "he had laid on top of her" during the prior summer. Dr. Lanese's physical examination of Tess "appeared within acceptable limits"; she "could not find any obvious signs of injury."

In response to the prosecutor's inquiry as to why Tess's examination was "normal," the doctor detailed several reasons. In sum, Dr. Lanese opined that unless she examines the child "acutely, meaning a day or two or three after an event occurred, [she] may not see anything because it heals." Also, "touching doesn't always leave a lot of marks." Dr. Lanese told the jury that Tess

> just described the private to private. She did not describe anything further. However, she d[id] indicate to [Dr. Lanese] that she had that stinging, burning sensation that she felt in her private area and [Tess] attributed it to what her grandfather did, and that usually indicates . . . that her urethra was irritated. That's a little further in past the labia. So, I cannot say that she said "in," but based on her medical findings, medical history, that might be in.

[(Emphasis added).]

11

Finally, when questioned about her "diagnostic assessment" of Tess, Dr. Lanese testified: "Based on the history that [Tess] provided <u>and the way she described things</u>, I would determine that she . . . has experienced sexual abuse." (Emphasis added). Dr. Lanese therefore recommended an evaluation "by a mental health professional for trauma-related therapy for sexual abuse."

Defendant did not object to this testimony. In response to defense counsel's questioning on cross-examination, Dr. Lanese confirmed her conclusions "w[ere] essentially based on the history because there was nothing physical to show." When questioned on recross-examination whether the physical examination "did not and could not lead [her] to conclude who actually committed any offense," Dr. Lanese responded: "<u>It is all based on the history.</u>" (Emphasis added).

Prior to sentencing, defendant moved for a new trial arguing, in part, that Dr. Lanese improperly opined that Tess had been sexually assaulted based solely on the child's statements here, where there was no physical or forensic evidence linking defendant to the offenses. Immediately following arguments, the court issued an oral decision denying the motion. Citing N.J.R.E. 702, which pertains to expert witnesses, the court concluded:

> There is no legal requirement in this case that there be physical evidence for a jury to determine that

12

the defendant was guilty of a sexual assault. The parties understood and agreed that the doctor would not be able to legally testify as to who committed the assault. In this case there was extensive detailed testimony by the victim, as noted, which even without physical corroboration could permit a jury to find the defendant guilty of the offenses charged. This court does not find the testimony or lack of any testimony, as pointed to by . . . defendant, controlling or in any way indicative of a jury's inability to find . . . defendant guilty of the offenses charged.

## II.

On appeal, defendant expands on the challenge he first raised to Dr. Lanese's testimony in his new trial motion. The crux of his argument is that Dr. Lanese implicitly opined on defendant's guilt based solely on Tess's complaints, rather than the doctor's clinical findings and, as such, the doctor improperly bolstered the victim's credibility. Defendant also claims Dr. Lanese's testimony included "overly detailed and cumulative" statements of Tess, which constituted improper fresh complaint evidence. Defendant further argues the admission of Dr. Lanese's testimony as lay opinion "deprived the jury of the requisite cautionary instruction" concerning credibility on expert testimony, see Model Jury Charges (Criminal), "Expert Testimony" (rev. Nov. 10, 2003), and fresh complaint evidence, see Model Jury Charges (Criminal), "Fresh Complaint" (rev. Feb. 5, 2007).

Pursuant to N.J.R.E. 701, a trial court may admit the testimony of a lay witness in the form of opinion if that testimony "(a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." Our Supreme Court has long recognized that a treating physician can testify as a lay witness under N.J.R.E. 701. See Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 563 (2016) (citations omitted).

The treating physician's testimony nonetheless is "subject to an important limitation." Id. at 579. That is, "[u]nless the treating physician is retained and designated as an expert witness, his or her testimony is limited to issues relevant to the diagnosis and treatment of the individual patient." Ibid. (citations omitted). Courts distinguish between treating physicians and other medical experts because treating physicians are not obtained in anticipation of litigation. Stigliano v. Connaught Lab. Inc., 140 N.J. 305, 313-14 (1995) ("Unlike an expert retained to testify at trial, [a] treating doctor[] gain[s] no confidential information about [the patient's] trial strategy.").

To the extent a particular matter in issue requires medical testimony beyond testimony about diagnosis and treatment of a patient, expert testimony may be required. Delvecchio, 224 N.J. at 579. That is so when the subject

matter of the testimony is beyond the ken of the average juror.  See State v. J.L.G., 234 N.J. 265, 280 (2018) (citation and quotations omitted).  The determination of whether expert testimony is required and admissible is committed to the trial court's sound discretion.  State v. Difrisco, 174 N.J. 195, 237 (2002) (citation omitted); see also State v. Scott, 229 N.J. 469, 479 (2017) (recognizing appellate courts review the trial court's evidentiary rulings for abuse of discretion).

We commence our analysis with our well-established standard of review. Because defendant failed to object to the belatedly-claimed trial errors, we review the matter for plain error, and may reverse only if the error was "clearly capable of producing an unjust result."  R. 2:10-2.  "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'"  State v. Williams, 168 N.J. 323, 336 (2001) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

As a preliminary matter, it is unnecessary to consider whether Tess's statements to Dr. Lanese were admissible as fresh-complaint evidence because the State has never contended they were.  Instead, the State argues Dr. Lanese's testimony detailing the medical history related by Tess was admissible under N.J.R.E. 803(c)(4).  This exception to the hearsay rule provides:

A-2310-18

> Statements made in good faith for purposes of medical diagnosis or treatment which describe medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof to the extent that the statements are reasonably pertinent to diagnosis or treatment.

Our Supreme Court has long recognized "the declarations of a patient as to his [or her] condition, symptoms and feelings made to his [or her] physician for the purpose of diagnosis and treatment are admissible in evidence as an exception to the hearsay rule." Cestero v. Ferrara, 57 N.J. 497, 501 (1971). The "rationale for that departure from the hearsay rule is that such statements possess inherent reliability because 'the patient believes that the effectiveness of the treatment he [or she] receives may depend largely upon the accuracy of the information he [or she] provides the'" medical professional. R.S. v. Knighton, 125 N.J. 79, 87 (1991) (citation omitted).

Because this hearsay exception is based on a presumed "treatment motive," a statement by a declarant who "is unaware that his or her statements will enable a physician to make a diagnosis and administer treatment" lacks the requisite degree of trustworthiness to qualify under this exception. See R.S., 125 N.J. at 87-88. Accordingly, hearsay obtained during evidence gathering and medical consultations conducted purely in preparation for litigation remains inadmissible. State in the Int. of C.A., 201 N.J. Super. 28, 33-34 (App. Div.

16

1985) (holding a statement was inadmissible under Evid. R. 63(12) – the predecessor of N.J.R.E. 803(c)(4) – because the evidence at trial did not establish "the girl believed that the doctor was questioning her so that he could treat her"); see also State v. Pillar, 359 N.J. Super. 249, 289 (App. Div. 2003) (recognizing that if a doctor's examination "was conducted for evidence gathering purposes, the hearsay statements contained in the medical history would be inadmissible" under N.J.R.E. 803(c)(4)). Thus, "ordinarily statements made as to the cause of the symptoms or conditions" are not admissible, Cestero, 57 N.J. at 501, because they are not relevant to the patient's treatment, State v. McBride, 213 N.J. Super. 255, 273 (App. Div. 1986).

In the present matter, Dr. Lanese testified as a lay witness – the State opting not to qualify the doctor as an expert witness, notwithstanding her obvious qualifications. Accordingly, Dr. Lanese testified that the purpose of her examination was for diagnosis and treatment, which included obtaining a history from Tess. The State elicited the details of that history, including Tess's hearsay statements that identified her grandfather as the perpetrator; the nature of the sexual and physical acts he performed; the child's assessment of blame; and how the incidents came to light. While those details may have been necessary for

diagnosis or treatment, we examine each category in turn to determine whether they were properly admitted through Dr. Lanese's trial testimony.

The nature of the sexual acts was necessary for diagnostic purposes because it informed Dr. Lanese as to the type of testing and physical examination that was required. However, the details provided by Tess through Dr. Lanese's testimony were unnecessary and should not have been admitted under N.J.R.E. 803(c)(4). To the extent that Tess took the stand at trial, provided the same version of the events she relayed to Dr. Lanese, and was subject to cross-examination, we might consider the admission of those details harmless. See State v. Cotto, 182 N.J. 316, 331 (2005) (holding an improper admission of an out-of-court statement was harmless error where: the declarant testified and was subject to cross-examination; and the statement "only echoed the early identification testimony and did not introduce new information to the jury that the jury would have been unable to consider otherwise").

However, Dr. Lanese overly-detailed the account provided by Tess and drew conclusions that exceeded the child's testimony. As one notable example, Dr. Lanese acknowledged Tess did not disclose that defendant penetrated her vagina. Nonetheless, the doctor opined that based on Tess's history, reporting a past "stinging, burning sensation . . . in her private area" – which Tess attributed

to "her grandfather" – the child's "urethra was irritated" and "that might [mean] in." In that regard, the doctor's opinion was based solely on Tess's statements here, where her physical examination was "normal." By accepting Tess's account in the absence of medical findings, Dr. Lanese implicitly – and improperly – vouched for Tess's credibility.

The identity of the perpetrator as the grandfather with whom Tess resided; how she reported the abuse; and that Tess felt her grandfather was "at fault" were relevant to Dr. Lanese's diagnosis and treatment because they informed Dr. Lanese's recommendation for mental health treatment. However, Tess's psychological treatment was not relevant to any issues at trial; no mental health experts testified and no reports in that regard were admitted in evidence. Accordingly, these details were improperly elicited at trial and were not admissible under N.J.R.E. 803(c)(4).

Moreover, when explaining why she questions a child victim as to who they believe is at fault, Dr. Lanese improperly interjected expert opinion, without being qualified to do so in this case. See J.L.G., 234 N.J. at 272 (holding expert testimony concerning Child Sexual Abuse Accommodation Syndrome unreliable, except in some instances involving a child's delayed disclosure of

19

the abuse). Here, Dr. Lanese improperly testified: "Many of them do not tell because of that fear and that shame that this is their fault."

The impropriety of this category of trial testimony was compounded by the doctor's opinion that Tess "experienced sexual abuse" based solely on the "history" Tess provided during the examination. As the State acknowledges: "The question in this case was plainly whether defendant sexually assaulted T[ess]." The answer therefore is two-fold: whether Tess was sexually assaulted; and, if so, whether defendant was the perpetrator. Like most "he said, she said" crimes, credibility was crucial to the State's case. Therefore, if the jury did not believe Tess's testimony, defendant could not have been convicted.

Here, Dr. Lanese not only testified in detail about Tess's disclosure but the doctor told the jury she believed Tess was sexually assaulted based on the child's statements "and the way she described things." These descriptions were inextricably interwoven with Tess's identification of her grandfather as the perpetrator. When probed on recross-examination that "the physical examination [of Tess] did not and could not lead [her] to conclude who actually committed" the offenses, Dr. Lanese responded: "It is all based on the history." By implication therefore, Dr. Lanese placed her imprimatur on Tess's credibility.

 A-2310-18

Accordingly, the admission of Dr. Lanese's ultimate opinion that Tess was sexually assaulted was improper under N.J.R.E. 701. However, even if Dr. Lanese had been qualified as an expert witness, her opinion arguably was inadmissible under N.J.R.E 704.

"Our evidence rules provide that 'otherwise admissible' expert testimony 'is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.'" State v. Human, 451 N.J. Super. 429, 444 (App. Div. 2017) (quoting N.J.R.E. 704). Moreover, as our Supreme Court has repeatedly recognized in criminal trials, "experts may not, in the guise of offering opinions, usurp the jury's function by, for example, opining about defendant's guilt or innocence." State v. McLean, 205 N.J. 438, 453 (2011) (citing State v. Papasavvas, 163 N.J. 565, 613 (2000)). Nor may the expert opine "in a manner that otherwise invades the province of the jury to decide the ultimate question." Ibid. (citing State v. Jamerson, 153 N.J. 318, 340 (1998)). Similarly, expert witnesses are not permitted "to opine on the credibility of parties or witnesses." Ibid. (citing Jamerson, 153 N.J. at 341).

We therefore conclude Dr. Lanese's opinion – whether deemed lay opinion under N.J.R.E. 701 or an ultimate expert opinion under N.J.R.E. 704 – was

21

improperly elicited by the State because that opinion invaded the province of the jury and vouched for Tess's credibility.

Because defendant did not raise the issues before the trial court, we must therefore decide whether these errors were harmless beyond a reasonable doubt. We must conduct an independent analysis of the quality of the evidence of defendant's guilt. State v. Sterling, 215 N.J. 65, 102 (2013). We do not act as a thirteenth juror. The question of whether the error was harmless beyond a reasonable doubt requires strong independent proof of defendant's guilt. Ibid.

While we acknowledge Tess's trial testimony detailed each incident, including a description of defendant's flaccid penis, and defendant acknowledged he had ED, defendant otherwise categorically denied he abused the child. The child's bedding and clothing were tested and a DNA sample was taken from defendant, but no forensic evidence inculpating defendant was discovered or admitted in evidence. Nor was there any other physical evidence of abuse. Because credibility therefore was paramount, we cannot conclude the admission of Dr. Lanese's opinion that Tess "experienced sexual abuse" was harmless here, where that opinion was based solely on Tess's account, which Dr. Lanese improperly elaborated upon on trial. Thus, the cumulative errors in this case warrant a new trial.

22

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2310-18